**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| Harry Jakeyia Ashford, et al., ) | Civil Action No. 06-cv-1561 (RJL) |
| ) | |
| individually and on behalf ) | Hon. Richard J. Leon |
| of all others similarly situated, ) | |
| ) | |
| *Plaintiffs*, ) | |
| v. ) | |
| ) | |
| East Coast Express Eviction, et al., ) | |
| ) | |
| *Defendants*. ) | |

_____)


**JOINT MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS',
A 1 EVICTION SERVICES, INC.'S, AND TANYA SMITH'S MOTION FOR
PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

    A.    History of the Litigation.............................................................................. 3

    B.    The Settlement Agreement ........................................................................ 4

        1.    Injunctive Relief............................................................................ 4

        2.    Settlement Fund ............................................................................ 5

        3.    Cooperation .................................................................................. 6

ARGUMENT ...................................................................................................................... 6

    A.    The Court Should Grant Preliminary Approval Of The Agreement
        Because It Is Fair, Adequate, And Reasonable Under The Circumstances
        And Serves The Best Interests Of The Class As A Whole ................................... 6

        1.    The Agreement Is The Result Of Arms-Length Negotiations
            Between Plaintiffs' And The A 1 Defendants' Counsel ............................ 7

        2.    The Terms Of The Settlement, Which Provide For Injunctive
            Relief Including Monitoring, Meaningful Monetary Damages, And
            Cooperation, Are Favorable To Plaintiffs.................................................. 9

        3.    Settlement Is Appropriate At This Stage Of The Litigation Because
            Plaintiffs Have Sufficient Information To Assess The Probability
            Of Success And Range Of Recovery ...................................................... 10

        4.    The Named Plaintiffs Have Reacted Favorably To The Terms Of
            The Settlement .......................................................................... 12

        5.    Plaintiffs' Counsel Has Significant Expertise In Complex Antitrust
            Class Action Litigation ............................................................... 12

        6.    The Complexity, Nature, And Expected Costs Of This Litigation
            Weigh Heavily In Favor Of Early Settlement........................................ 12

        7.    A 1 Is Unlikely To Be Able To Absorb A Larger Recovery
            Because It Is A Small Business With Limited Capital Resources
            And Ms. Smith Is Its Sole Shareholder.................................................. 13

        8.    Conclusion ................................................................................ 13

    B.    The Court Should Certify The Settlement Class For The Reasons Set Forth
        In The Plaintiffs' Memorandum In Support Of Their Motion For Class
        Certification ............................................................................................ 14

# TABLE OF CONTENTS
### (continued)

Page

1.    Rule 23(A): The Proposed Class Satisfies The Four Prerequisites Of Numerosity, Commonality, Typicality, And Adequacy ..................... 15

    (A)   Numerosity: Because The Class Contains Over Ninety-Four Members (And Potentially Thousands), Joinder Of All Class Members Is Impracticable ................................................. 15

    (B)   Commonality: Common Issues Of Law And Fact Regarding Minimum Wage And Antitrust Violations Apply To All Class Members. ................................................................ 16

    (C)   Typicality: The Named Plaintiffs' Claims Arise From The Same Events And Invoke The Same Legal Arguments As The Other Class Members' Claims ............................................... 17

    (D)   Adequacy: The Named Plaintiffs And Class Counsel Will Faithfully, Vigorously, And Effectively Represent The Class ..................................................................................... 17

2.    Rule 23(b): The Court Should Certify The Class As A Hybrid Injunction And Damages Class ................................................. 19

    (A)   Rule 23(b)(2): The Proposed Class Is A Proper Injunctive Class Because Defendants' Wage Practices Apply Generally To The Entire Class And Plaintiffs Seek Injunctive Relief On Behalf Of The Entire Class ....................... 19

    (B)   Rule 23(b)(3): The Proposed Class Is A Proper Damages Class Because Common Questions Of Liability And Damages Predominate Over Individual Questions Of Damages And A Class Action Is A Superior Method For Adjudication Of The Class Members' Claims ........................... 20

       (I)   Common Questions Of Law And Fact Regarding Liability And Damages Predominate Over Individual Damages Issues ............................................. 20

       (Ii)   A Class Action Is Superior To Any Other Method Of Resolving The Class Members' Claims. ................... 21

C.    The Court Should Order That Notice Be Given To The Class As Set Forth In The Class Certification Memorandum. ......................................... 23

    1.   Plaintiffs' Proposed Notice Plan Is Crafted To Ensure The Best Notice To The Class Under The Circumstances ..................................... 23

    2.   Content Of The Proposed Notice ........................................... 26

**TABLE OF CONTENTS**
(continued)

**Page**

3.    Opt-Out Deadlines ........................................................................... 26

4.    Payment For Notice Expenses Should Be Authorized From The
      Settlement Fund .............................................................................. 26

D.    The Court Should Schedule A Fairness Hearing And A Schedule For
      Submission Of Objections And Responses............................................ 27

CONCLUSION.................................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

CASES

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997)............................................................................22

*In re Baan Co. Sec. Litig.,*
   284 F. Supp. 2d 62 (D.D.C. 2003) ............................................7, 9, 10, 13

*Ball v. AMC Entm't, Inc.,*
   315 F. Supp. 2d 120 (D.D.C. 2004) ..................................... Passim

*Bynum v. Dist. of Columbia,*
   214 F.R.D. 27 (D.D.C. 2003)..........................................................15, 19

*Bynum v. Dist. of Columbia,*
   412 F. Supp. 2d 73 (D.D.C. 2006) ...............................................27

*Bynum v. Gov't of Dist. of Columbia,*
   384 F. Supp. 2d 342 (D.D.C. 2005) .............................................26

*Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.,*
   239 F.R.D. 9 (D.D.C. 2006).............................................................19

*James v. England,*
   226 F.R.D. 2 (D.D.C. 2004).............................................................14

*Jarvaise v. Rand Corp.,*
   212 F.R.D. 1 (D.D.C. 2002).............................................................16

*In re Lorazepam & Clorazepate Antitrust Litig.,*
   205 F.R.D. 369 (D.D.C. 2002)..................................... Passim

*In re Lorazepam & Clorazepate Antitrust Litig.,*
   No. 99-0790, 2003 WL 22037741 (D.D.C. June 16, 2003)...................11

*Phillips Petro. Co. v. Shutts,*
   472 U.S. 797 (1985)........................................................................21

*Pigford v. Glickman,*
   182 F.R.D. 341 (D.D.C. 1998).........................................................17

*Pigford v. Glickman,*
   185 F.R.D. 82 (D.D.C. 1999)........................................................7, 9

i

*Thomas v. Albright*,
    139 F.3d 227 (D.C. Cir. 1998) ......................................................................... 6-7, 12, 15

*Twelve John Does v. Dist. of Columbia*,
    117 F.3d 571 (D.C. Cir. 1997) ...........................................................................17

*In re Veneman*,
    309 F.3d 789 (D.C. Cir. 2002) ...........................................................................14

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002).....................................................................16, 18, 21

*In re Vitamins Antitrust Litig.*,
    No. 99-197, 2000 WL 1737867 (D.D.C. March, 31, 2000)...................................10

*In re Vitamins Antitrust Litig.*,
    No. 99-197, 2001 WL 856290 (D.D.C. July 19, 2001) .......................................7, 8

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ................................................................................................... Passim

ii

Defendants A 1 Eviction Services, Inc. ("A 1") and Tanya Smith (collectively, the "A 1 Defendants") (with plaintiffs, the "Settling Parties") and the plaintiffs jointly submit this memorandum in support of their Motion for Preliminary Approval of their Proposed Settlement. For the reasons set forth below, the Court should grant the motion in its entirety.

INTRODUCTION

This class action seeks to end the widespread practice in the Washington eviction industry of paying illegally low wages to homeless employees who provide the bulk of the labor used to perform evictions in the area. Defendants – eviction companies and their proprietors – routinely pick up teams of ten or more employees[1] at District homeless shelters and soup kitchens to perform a day's evictions. (*See* Am. Compl. ¶¶ 43; Ex. B, Eighty-Seven Employee Affidavits.) Plaintiffs allege that defendants have long had a consistent and pervasive practice of remunerating homeless (and other) employees a rate of $5 per eviction regardless of how many hours the employees are required to work, wait for work, or be transported around the area from one worksite to another. (Am. Compl. ¶¶ 61.) This pittance almost invariably renders an hourly rate far below any applicable minimum wage. *Id*. ¶¶ 49, 61, 66, 69, 72, 75, 78, 81, 84; (Ex. B, Eighty-Seven Employee Affidavits.) Furthermore, plaintiffs allege that these low wages not only violate federal and state labor laws but are the result of concerted action among the defendants to keep their own labor costs artificially low at the expense of some of our city's most powerless and vulnerable citizens.

The A 1 Defendants have not admitted liability but seek settlement to resolve the disputed claims. Nevertheless, through the settlement presented with this motion, the Settling

---

[1] The U.S. Marshal Service requires that all evictions performed in the District of Columbia use a minimum of ten workers. (*See* Ex. H, U.S. Marshals Service, *Service of Writs of Restitution (Evictions)*.)

1

Defendants have committed themselves to avoiding the alleged wage practices and to ensuring that in the future their employees receive proper wages for the services they provide. Indeed, the Proposed Settlement amply addresses plaintiffs' primary goals in bringing this lawsuit – injunctive relief against future wage violations as well as some compensation for past lost wages. Today, A 1 Eviction Services presents itself as a model company.

The Settlement Agreement dated January 23, 2007 (the "Agreement"), Ex. A, represents the fruit of earnest and constructive negotiations among the Settling Parties from early in the litigation. The Agreement resolves this litigation as to the A 1 Defendants in exchange for entry of an injunction preventing future antitrust and minimum wage violations coupled with an auditing system to ensure compliance, a $30,000 settlement payment, and covenants of cooperation with plaintiffs for the remainder of this litigation. The Agreement represents a positive result for both the class and for the A 1 Defendants, both in absolute terms and when balanced against the risks and rewards the Settling Parties face in the litigation and at trial.

As set forth fully below, the proposed settlement amply satisfies the requirements of Federal Rule of Civil Procedure 23. The settlement is fair, reasonable, and adequate to the plaintiff class, and is a reasonable compromise between plaintiffs and the A 1 Defendants, given the legal and factual complexities involved in this matter, the inherent uncertainty about ultimate resolution, and the likely expense and delay of litigation. This settlement represents a first step in bringing the eviction industry into compliance with the law and bringing justice to their homeless employees.

Accordingly, the Settling Parties respectfully request that the Court issue an order: (i) preliminarily approving the proposed settlement as fair, reasonable, and adequate pursuant to Rule 23(e); (ii) conditionally certifying the settlement class; (iii) approving the form and content

of the Proposed Notice to the Class; (iv) approving a disbursement from the settlement fund to pay for notice; and (v) setting a date for a fairness hearing.

BACKGROUND

A.    History Of The Litigation

On September 5, 2006, plaintiffs filed their original complaint against eleven defendants. (Docket Item No. 1.) The complaint alleged an industry-wide practice among the defendant eviction companies of hiring mostly homeless employees to perform evictions and paying them a standard rate of $5 per eviction, resulting in wages significantly below the minimum wage in the District of Columbia, Maryland, or Virginia. (Compl. ¶ 54.) Furthermore, the complaint alleged that defendants colluded with one another to suppress wages in violation of the antitrust laws. (Compl. ¶ 68.) The complaint requested both prospective and retrospective relief for a class of employees who have been injured by these wage violations and conspiratorial acts.

The Court has denied four motions to dismiss and permitted the voluntary dismissal of one defendant. On December 20, 2006, the Court granted plaintiffs leave to amend their complaint, adding five additional defendants. (Am. Compl., Docket Item No. 54.) As of today, seven defendants remain in default in this action, and four defendants are actively litigating. Discovery is now fully underway.

Plaintiffs and the A 1 Defendants have reached a compromise and settlement. On February 15, 2007, the Settling Parties submitted a motion to stay the proceedings as to the A 1 Defendants in light of the Agreement, and on March 5 and 27 the Court held status conferences at which the Settling Parties advised the Court that a settlement had been reached between and among them.

3

B.    <u>The Settlement Agreement</u>

The Agreement is the result of several months of negotiations between plaintiffs' counsel and the A 1 Defendants' counsel.  (*See* Ex. I, Dembowski Aff. ¶ 3.)  The Agreement provides that plaintiffs will release their claims against the A 1 Defendants in exchange for cash and non-cash consideration.  The Agreement provides the following benefits to the class:

1.    <u>Injunctive Relief.</u>

The A 1 Defendants have agreed to the entry of an injunction that will:

- require the A 1 Defendants to accord each employee at least the benefits of the minimum wage and minimum hours laws applicable in the jurisdiction in which the employee performs eviction work; (Agreement ¶ 8(b).)

- require the A 1 Defendants to pay employees for eviction work even when the eviction is cancelled;  (Agreement ¶ 8(e).)

- prohibit any agreement with any person that violates any antitrust statute, including an agreement to pay employees a sub-minimum wage for eviction work;  (Agreement ¶ 8(a).)

- require the maintenance of wage records for all employees; (Agreement ¶ 8(f).)

- oblige the A 1 Defendants to cooperate with an independent auditor who will monitor compliance with the Agreement; (Agreement ¶ 10.) and

- require the A 1 Defendants to self-report any violations of the injunction to the National Coalition for the Homeless, a leading advocacy group for the homeless. (Agreement ¶ 9.)

It is noteworthy that the A 1 Defendants are already complying with these terms, including paying employees the minimum wage and self-reporting a problem that has arisen and its timely resolution.  (*See* Ex. G, Letter from Tanya H. Smith, President, A 1 Eviction Services, Inc., to Michael Stoops, Acting Director, National Coalition for the Homeless (March 15, 2007).)

2.    Settlement Fund.

Under the Agreement, the A 1 Defendants will pay $30,000 for the benefit of the Settlement Class, payable in 18 monthly installments of $1,666.67. A 1 has already made its initial payment into an interest bearing escrow account maintained at Mercantile Potomac Bank in accordance with the Agreement. Because of its timing as the first settlement in the litigation, the other non-monetary benefits obtained, and the limited ability of the A 1 Defendants to pay more, this settlement is worthy of the Court's approval.

The plaintiffs propose that distribution of the settlement fund paid by the A 1 Defendants (as well as payments made by any future settling defendants or payments made pursuant to a judgment in this case) be overseen by a claims administrator, who will hear and evaluate claims for individual payment made by class members and determine an equitable method for distribution. To ensure that funds are fairly distributed among eligible class members, the claims administrator may determine that distribution should be delayed until more payments are made into the settlement fund (whether by the A 1 Defendants or other defendants). The Settling Parties propose that the claims administrator be Richard deCourcy Hinds, a Senior Counsel at plaintiffs' counsel's firm. Mr. Hinds is an experienced litigator who has been a member of the bar since 1967, served as a law clerk to the Honorable Leonard P. Moore on the United States Court of Appeals for the Second Circuit, and has litigated numerous class action and multi-party lawsuits. Mr. Hinds has agreed to serve as claims administrator on a *pro bono* basis, which ensures that his service in this role will not reduce the total recovery available to the class. Once the claims administrator determines that a sufficient amount has been paid into the settlement fund, plaintiffs and the claims administrator will present to the Court a detailed disbursement plan for its approval.

5

2.    Cooperation.

The A 1 Defendants have also agreed to cooperate with plaintiffs in connection with the

litigation, including by providing testimony and documents. (Agreement ¶ 12.)

In exchange for the consideration to the class described above, plaintiffs and the class

will dismiss the claims against the A 1 Defendants with prejudice and release the A 1 Defendants

from future liability regarding the acts described in the Amended Complaint.  (Agreement ¶ 2.)

Finally, the Agreement provides that, should the Court preliminarily approve the

settlement, plaintiffs will, in accordance with Rule 23, take reasonable and appropriate steps to

provide notice of the Agreement's preliminary approval, the date of the fairness hearing, and

class members' rights to object to the settlement or to opt out of it.  (Agreement ¶ 5.)  As

discussed below, plaintiffs have developed a proposed notice and notice plan that comports with

Rule 23's requirements.

ARGUMENT

A.    The Court Should Grant Preliminary Approval Of The Agreement Because It Is
Fair, Adequate, And Reasonable Under The Circumstances And Serves The Best
Interests Of The Class As A Whole.

In a class action, no settlement releasing claims of the class can be final until the Court

approves it.  Fed. R. Civ. P. 23(e).  The Court has broad discretion in deciding whether to grant

such approval.  *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 375 (D.D.C.

2002).  In exercising its discretion, the Court should be guided by the "principle of preference,"

the "long-standing judicial attitude favoring class action settlements."  *Id.* (internal citations

omitted).  The Court should consider whether the proposed settlement is "fair, reasonable and

adequate under the circumstances and whether the interests of the class as a whole are being

served if the litigation is resolved by settlement rather than pursued."  *Id.* (citing *Manual for

Complex Litig. (Third)* § 30.42, at 238 (1995)); *see also Thomas v. Albright*, 139 F.3d 227, 231

6

(D.C. Cir. 1998) (affirming approval of settlement where plaintiff class alleged violations of Title VII and received monetary and injunctive relief); *Pigford v. Glickman*, 185 F.R.D. 82, 95 (D.D.C. 1999) (approving settlement that did "not provide the plaintiffs and the class they represent with everything they sought in the complaint" because the settlement was "intended to achieve much of what was sought without the need for lengthy litigation and uncertain results").

In determining whether a settlement is acceptable, the Court should consider a variety of factors, including (1) whether the settlement is the result of arms-length negotiations, (2) the terms of the settlement in relation to the strength of the plaintiffs' case, (3) the stage of litigation proceedings at the time of settlement, (4) the reaction of the class, and (5) the opinion of experienced counsel. *See, e.g.*, *Lorazepam*, 205 F.R.D. at 375 (citing *Thomas*, 139 F.3d at 231). The Court may also consider (6) the complexity, nature, and costs of litigation and (7) the ability of the defendant to absorb a larger recovery. *In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d 62, 64 (D.D.C. 2003). As discussed in further detail below, consideration of all of these factors shows that the settlement with the A 1 Defendants is fair, reasonable, and adequate and should therefore be approved.

      1.     <u>The Agreement Is The Result Of Arms-Length Negotiations Between Plaintiffs' And The A 1 Defendants' Counsel.</u>

This Court has noted that "[a] 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel[.]'" *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 856290, at *2 (D.D.C. July 19, 2001) (quoting *Manual for Complex Litig.* § 30.42). Because plaintiffs' counsel and the A 1 Defendants' counsel conducted their settlement negotiations at arms-length, the settlement should be presumed fair, adequate, and reasonable.

Plaintiffs and the A 1 Defendants conducted several adversarial negotiations concerning settlement, including in-person meetings, telephone conferences, and email correspondence. (*See* Ex. I, Dembowski Aff. ¶ 3.)  They exchanged numerous settlement proposals throughout the negotiations.  At all times, counsel for each party sought to advance the interests of its respective clients.  *See Lorazepam*, 205 F.R.D. at 376 (approving settlement reached through arms-length negotiations where "experienced counsel on all sides conducted lengthy and adversarial negotiations, involving numerous face-to-face meetings and telephone conferences, and . . . exchanged several proposals before reaching" the ultimate settlement agreement).

The Agreement represents a compromise between the Settling Parties where neither side received all of what it initially sought – a factor that the Court has considered favorably in determining whether a settlement is the product of an arms-length negotiation.  *See Ball v. AMC Entm't, Inc.,* 315 F. Supp. 2d 120, 132 (D.D.C. 2004) (approving settlement where it reflected a number of compromises from the parties' original positions).  Because the attorneys at all times advanced the interests of their clients and reached an agreement that is a compromise between the Settling Parties' positions, the Agreement should be considered the product of arms-length negotiations.

The Court has also noted the importance of "meaningful discovery" to support the fairness of a settlement.  *Vitamins*, 2001 WL 856290, at *2.  Although formal discovery had not yet commenced at the time the Settling Parties executed the Agreement, plaintiffs conducted a diligent investigation and informed themselves about defendants' business activities and financial resources.  Plaintiffs' counsel conducted numerous interviews with potential class members to determine the extent of the A 1 Defendants' involvement in the alleged violations. (*See generally* Ex. B, Eighty-Seven Employee Affidavits; Ex. I, Dembowski Aff. ¶ 2.)

Plaintiffs' counsel also reviewed A 1's tax returns to ascertain its financial situation and ability to pay a larger settlement amount.  (Ex. I, Dembowski Aff. ¶ 4.)  As a result of this fact gathering, plaintiffs' counsel's discovery of the A 1 Defendants' activities and resources was meaningful, and their decision to enter into the Agreement was well informed.

> 2.    The Terms Of The Settlement, Which Provide For Injunctive Relief Including Monitoring, Meaningful Monetary Damages, And Cooperation, Are Favorable To Plaintiffs.

Courts recognize that litigation entails substantial risk and does not guarantee monetary recovery and therefore favor settlement when continuing litigation would require "substantial additional pretrial preparation and expense [where] the defendants have denied all liability." *Lorazepam*, 205 F.R.D. at 377; *see also Baan*, 284 F. Supp. 2d at 65 (approving settlement and finding that there were significant risks associated with plaintiffs' ability to prove liability and damages at trial where defendants denied liability and plaintiffs faced uncertainties as to proving damages); *Pigford*, 185 F.R.D. at 104 (approving settlement where "bringing [the] case to trial likely would have been a very complex, long and costly proposition").  Here, the settlement is favorable to plaintiffs because it provides them with significant relief (indeed, similar relief to what they would achieve from success at trial) without the uncertainty, complexity and cost of trial.

In determining whether the terms of the settlement are favorable to plaintiffs considering the strength of their case, the Court must consider any difficulties plaintiffs may face in proving their case if it were to proceed to trial.  In *Ball*, the Court noted that it would be difficult for plaintiffs to prove at trial that the type of hearing-impaired accommodation they sought as relief would be required by the Americans with Disabilities Act.  315 F. Supp. 2d at 130.  The Court noted that "[g]iven the great uncertainty about Plaintiffs' chances of success at trial in requiring

Defendants to provide" the accommodation sought, the settlement was fair, reasonable and adequate because it provided significantly increased access by hearing-impaired plaintiffs to movie theaters. *Id.* Likewise, in *Baan*, the Court approved settlement where plaintiffs faced uncertainties concerning damages and would have faced difficulties proving them. 284 F. Supp. 2d at 65. Although plaintiffs anticipate success in this case and have confidence in the strength of their claims, no litigation is risk-free. In light of the potential uncertainty inherent in any factual dispute, the cash component of the settlement here should be considered fair and adequate.

As in *Lorazepam*, *Baan*, and *Pigford*, the A 1 Defendants have also denied liability. As such, the Court should consider the fact that, as in those cases, bringing this case to trial would require "complex, long and costly" preparations. Indeed, the Court has noted that antitrust price fixing cases like this case "are generally complex, expensive, and lengthy." *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1737867, at *3 (D.D.C. March, 31, 2000).

Moreover, because the Agreement largely provides the same injunctive relief sought in the complaint, the Agreement affords plaintiffs much of what they would obtain from success at trial and should therefore be considered fair and adequate.

        3.    <u>Settlement Is Appropriate At This Stage Of The Litigation Because Plaintiffs Have Sufficient Information To Assess The Probability Of Success And Range Of Recovery.</u>

Although this settlement has come relatively early in the litigation, as noted above, plaintiffs have been able to obtain sufficient information to assess the probability of success at trial. In addition, approving settlement now will provide plaintiffs with the relief they seek much sooner than if the case went through trial (and possibly appeal). Courts favor early settlement of class action cases. *See*, *e.g., id.* at *3 (noting that, "[e]arly settlements benefit everyone involved

in the process and everything that can be done to encourage such settlements – especially in complex class action cases – should be done" (internal citations omitted)).  In approving the settlement in *Ball*, the Court considered the fact that "it [would be] unlikely that class members would be provided with the accommodation they seek anytime in the next two to three years" given the court's trial calendar and potential appeals.  315 F. Supp. 2d at 131.  Likewise here, the Court should consider the fact that approving the settlement now will require the A 1 Defendants to pay its employees the applicable minimum wage much earlier than if the case were to go through trial and possible appeals.

Balanced with the interest in early settlement of class actions is the consideration of whether counsel has sufficient information "to reasonably assess the risks of litigation vis-à-vis the probability of success and range of recovery."  *Lorazepam*, 205 F.R.D. at 378 (noting that "only some reasonable amount of discovery should be required" to make the determination of the risks of litigation).  In giving final approval to the settlement, the *Lorazepam* court noted that the case was still in the discovery stage and that the parties avoided significant expenses and guaranteed cash recovery by entering into the settlement agreement before the close of discovery.  *In re Lorazepam & Clorazepate Antitrust Litig.,* No. 99-0790, 2003 WL 22037741, at *5 (D.D.C. June 16, 2003).  Although discovery had not yet begun when settlement was reached here, plaintiffs' counsel had the opportunity to gather considerable information from the A 1 Defendants' employees and to assess the A 1 Defendants' financial situation through an informal provision of A 1's tax returns.  Based on such inquiry, plaintiffs' counsel considers the settlement to be an adequate resolution of the case against these defendants.  Furthermore, resolution at this early state allows the A 1 Defendants to avoid depleting its limited funds with the significant costs of discovery, ensuring greater cash recovery for the class.

11

4.    The Named Plaintiffs Have Reacted Favorably To The Terms Of The Settlement.

While it is too early to know the reaction of all class members to the settlement, it is telling that all seven of the named plaintiffs, each a typical class member, has approved the settlement. *See* Ex. I, Dembowski Aff. ¶ 3; *cf. Thomas*, 139 F.3d at 232 (noting that "a settlement can be fair even though a significant portion of the class and some of the named plaintiffs object to it."). The Court will be better able to assess this factor after the fairness hearing, but there is no indication that class members will react negatively to this settlement. Accordingly, this factor should not hinder the settlement's preliminary approval.

5.    Plaintiffs' Counsel Has Significant Expertise In Complex Antitrust Class Action Litigation.

Courts have recognized that in assessing the adequacy of a proposed settlement, the "[o]pinion of experienced and informed [counsel] should be afforded substantial consideration[.]" *Lorazepam*, 205 F.R.D. at 380 (internal citations omitted). In particular, the *Lorazepam* court noted that plaintiffs' counsel there had "considerable expertise in complex antitrust and class action litigation." *Id.* Plaintiffs' counsel has extensive experience in representing clients in cases involving the same sort of complex antitrust and class action issues presented here. As a result, the Court should consider this expertise in approving the settlement.

6.    The Complexity, Nature, And Expected Costs Of This Litigation Weigh Heavily In Favor Of Early Settlement.

This litigation presents a number of complexities. It involves a large number of plaintiffs with no permanent addresses and a large number of defendants. Discovery in this case will require numerous depositions, extensive document review, and potential third party discovery, which may all result in numerous discovery disputes. To show class-wide impact and damages, plaintiffs will employ an expert economist to analyze the effects of the alleged conspiracy and

12

wage violations.  Finally, a trial of fifteen defendants would impose significant costs on all

parties.  In all, an early settlement will save the Settling Parties (as well as the Court) significant

time and resources.

       7.    <u>A 1 Is Unlikely To Be Able To Absorb A Larger Recovery Because It Is
A Small Business With Limited Capital Resources And Ms. Smith Is Its
Sole Shareholder.</u>

In approving a settlement, the Court should consider the defendants' ability to pay

damages in excess of that to which the parties agreed.  In *Baan*, the court approved a

comparatively small settlement payment from a foreign defendant with dwindling financial

resources.  284 F. Supp. 2d at 66.  The court found a "serious risk that the continued prosecution

of the case – even if successful – would result in a judgment against the Defendants that would

be partially, if not completely, uncollectible."  *Id*.  Here, while the A 1 Defendants do not have

dwindling assets, it is apparent from plaintiffs' counsel's investigations that the A 1 Defendants

have limited financial resources.  Were this litigation to continue, the A 1 Defendants would no

doubt incur substantial legal fees that could further limit their ability to satisfy an adverse

judgment.  It is also apparent from plaintiffs' due diligence that the settlement is not significantly

less than the A 1 Defendants' maximum ability to pay.  As such, the Agreement is reasonable

and should be approved.

       8.    <u>Conclusion.</u>

In analyzing the foregoing criteria, the Court should determine that the Agreement is fair,

adequate, and reasonable under the circumstances.  Furthermore, it is in the best interests of the

plaintiff class and the A 1 Defendants for the Court to approve the Agreement.  Indeed, "[w]hat

this settlement can – and does – provide is an enormous step forward towards improving the

quality of life of [plaintiffs]."  *Ball*, 315 F. Supp. 2d at 132 (approving settlement that provided

hearing-impaired plaintiffs with a limited amount of access to hearing-assisted technology movie

theaters). Here, the settlement agreed upon by the Settling Parties will dramatically improve the

plaintiff class members' quality of life by increasing the wages the mostly homeless plaintiff

class members are paid to perform eviction work, as well as affording them some back-pay for

prior evictions performed at sub-minimum wages.

     B.     <u>The Court Should Certify The Settlement Class.</u>

In accordance with the requirements of the Agreement, the plaintiffs now seek

certification of a class, defined as:

> All persons (homeless or otherwise) employed by one or more Defendants
> to perform eviction services and paid a sub-minimum wage (the "Class")
> at any time from September 5, 2002 to the Notice Date (the "Class
> Period").

(Settlement Agreement ¶ 4.) The Court should certify the proposed class because the class meets

all of the requirements of Federal Rule of Procedure 23.

The Court has broad discretion to certify a class within the framework of Rule 23. *James

v. England*, 226 F.R.D. 2, 5 (D.D.C. 2004). Under the Federal Rules of Civil Procedure, "a class

can be certified if it meets Rule 23(a)'s four requirements – numerosity, commonality, typicality,

and adequacy of representation – and if it falls into one of the three categories of class actions

described in Rule 23(b)." *In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002).

Here, the proposed class meets all of the requirements of Rule 23(a) and falls within not

one, but two parts of Rule 23(b). The class consists of at least ninety-four (and potentially more

than one thousand) members and thus meets the numerosity requirement. There are common

questions of law and fact regarding defendants' consistent and identical wage practices as well as

their conspiracy to suppress wages that meet the commonality requirement. The named

plaintiffs' claims are sufficiently similar to the rest of the class members' claims to satisfy the

typicality requirement.  Both the named plaintiffs and their attorneys have and will vigorously

and faithfully prosecute the class's claims, fulfilling the adequacy requirement.

 With respect to Rule 23(b), the proposed class satisfies the requirements for an injunctive

class under 23(b)(2) because plaintiffs allege that defendants have colluded to enforce a common

scheme of wage violations against all class members, which plaintiffs seek to stop with a

universally applicable injunction.  Furthermore, the proposed class also satisfies the requirements

for a damages class under 23(b)(3), because the common issues of defendants' liability and

class-wide damages predominate over any individual issues and a class action is the superior

method for resolution of the class's claims.

  1. <u>Rule 23(A): The Proposed Class Satisfies The Four Prerequisites Of Numerosity, Commonality, Typicality, And Adequacy.</u>

  (a) <u>Numerosity:  Because The Class Contains Over Ninety-Four Members (And Potentially Thousands), Joinder Of All Class Members Is Impracticable.</u>

Rule 23(a)(1) requires that the class be so numerous that joinder of all members becomes

impracticable.  To satisfy this prerequisite, courts in this and other jurisdictions have repeatedly

held that the Settling Parties "need not provide the exact number of potential class members."

*Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 33 (D.D.C. 2003). While there is no specific

numerical threshold for class size, courts routinely certify cases with forty or more members.

*See, e.g.*, *id.* at 32 ("[g]enerally speaking, courts have found that a proposed class consisting of at

least forty members will satisfy the impracticability requirement"); *Thomas v. Christopher*, 169

F.R.D. 224, 237 (D.D.C. 1996) ("numerosity is generally satisfied by a proposed class of at least

40 members"), *rev'd in part on other grounds*, 139 F.3d 227 (D.C. Cir. 1998).

 Here, the proposed class consists of at least ninety-four members – well over double that

normally recognized as sufficient to fulfill the numerosity requirement.  At a minimum, the class

15

consists of the seven named plaintiffs plus eighty-seven other employees who have provided

sworn affidavits attesting that they have received sub-minimum wages from defendants.  (*See*

Ex. B, Eighty-Seven Employee Affidavits.)  Indeed, given the fact that during the class period

over 10,000 evictions requiring ten employees each have occurred in D.C., along with

approximately 20,000 evictions in other jurisdictions in the D.C. Metropolitan Area, it is likely

that the class actually contains thousands of members.  (*See* Am. Compl. ¶ 30.)

> (b)  <u>Commonality:  Common Issues Of Law And Fact
> Regarding Minimum Wage And Antitrust Violations Apply
> To All Class Members.</u>

Rule 23(a)(2) requires questions of law or fact common to the class.  "The commonality

test is met when there is at least one issue" whose resolution will affect all or a significant

number of the putative class members.  *Jarvaise v. Rand Corp.*, 212 F.R.D. 1, 3 (D.D.C. 2002).

Courts have noted that the commonality requirement is therefore "often easily met" because it

may be satisfied by a single common issue.  *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 259

(D.D.C. 2002).

Here, at a minimum, the legal and factual questions of whether defendants systematically

paid the class suppressed wages and whether that systematic scheme of low payment was the

result of a conspiracy among the defendants are common to all class members.  Resolution of

those questions will be required for each class member's claims.  (*See* Ex. B, Eighty-Seven

Employee Affidavits; *see also* Am. Compl. ¶¶ 30, 37, 61, 114-42.)  Accordingly, the Settling

Parties have demonstrated common issues that satisfies the Rule 23(a)(2).

(c)    Typicality:  The Named Plaintiffs' Claims Arise From The
Same Events And Invoke The Same Legal Arguments As
The Other Class Members' Claims.

Rule 23(a)(3) requires that the Court certify a class only where "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  The typicality requirement "is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998).

Here, the named plaintiffs' claims and legal arguments are virtually identical to those of each class members.  First, the same illegal practice – payment of sub-minimum wages by a defendant – that gives rise to the named plaintiffs' claims also gives rise to the class members' claims. (Am. Compl. ¶¶ 64-84.)  All seven named plaintiffs, like all of the class members, were injured not only by the defendant who paid them improper wages but by every defendant who participated in the conspiracy to suppress those wages.  (*Id.* ¶¶ 87-88.)  Second, the named plaintiffs' legal arguments in this case are identical to the legal arguments absent class members would bring if they pursued their claims independently.  Accordingly, the named plaintiffs' claims are typical of the class members' claims.

(d)    Adequacy: The Named Plaintiffs And Class Counsel Will
Faithfully, Vigorously, And Effectively Represent The
Class.

Rule 23(a)(4) requires that "parties will fairly and adequately protect the interests of the class."  To satisfy this prerequisite, the Settling Parties must show that (1) there is no conflict between the named plaintiffs and the class members and (2) counsel will vigorously prosecute the case and are qualified to do so.  *See Twelve John Does v. Dist. of Columbia*, 117 F.3d 571,

17

576 (D.C. Cir. 1997) (citing *Nat'l Ass'n of Reg'l Med. Programs, Inc. v. Mathews*, 551 F.2d 340, 345 (D.C. Cir. 1976)).  The named plaintiffs and their counsel meet these adequacy requirements.

First, the interests of the named plaintiffs are aligned with the interests of the proposed class.  As the named plaintiffs and the class members all suffered from the same conspiracy to suppress wages and the same blatantly illegal wage practices, the named plaintiffs have as much incentive to prosecute the case as any class member would.  *See Vitamins,* 209 F.R.D. at 262 ("[B]ecause the plaintiffs have alleged an overarching single conspiracy . . ., all named plaintiffs will have the same incentive to the case as any absentee class member.").

Second, proposed class counsel – attorneys with Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") – have and will vigorously prosecute this case and are qualified to do so. Information on the relevant experience of Cleary Gottlieb and the proposed class counsel's expertise in class action and antitrust litigation is located in Exhibit F, The Cleary Gottlieb Steen & Hamilton LLP Firm Resume.  Indeed, Cleary Gottlieb's vigorous pursuit of the class's claims and substantial efforts have already led to positive results for the class.  Cleary Gottlieb has conducted an extensive investigation of the eviction industry, interviewed hundreds of victims and potential victims, and has negotiated and concluded the present settlement for the class. Finally, Cleary Gottlieb is appearing in this matter on a *pro bono* basis, which will help ensure that the class receives maximum financial recovery from an eventual judgment.

Because the class is sufficiently large, class members face common issues to be resolved, the named plaintiffs are typical of the class members, and the named plaintiffs and their counsel will adequately represent the interests of the class, the proposed class satisfies all four prerequisites of Rule 23(a).

2.    Rule 23(b):  The Court Should Certify The Class As A Hybrid
Injunction And Damages Class.

The Settling Parties seek certification of a "hybrid" class under Rule 23(b)(2) and Rule

23(b)(3), because the complaint asks for both substantial, permanent injunctive relief and

significant damages.  "This Circuit has previously held that such a hybrid class may be certified

at the court's discretion, as long as the requirements of both provisions are met."  *Bynum*, 217

F.R.D. 43, 48 (D.D.C. 2003) (citing *Eubanks v. Billington,* 110 F.3d 87, 96 (D.C. Cir. 1997)).

The proposed class meets the requirements of both Rule 23(b)(2) and Rule 23(b)(3), and the

Court should certify the proposed class under both provisions.

(a)    Rule 23(b)(2):  The Proposed Class Is A Proper Injunctive
Class Because Defendants' Wage Practices Apply
Generally To The Entire Class And Plaintiffs Seek
Injunctive Relief On Behalf Of The Entire Class.

Rule 23(b)(2) requires the Settling Parties to show that the defendants have "acted or

refused to act on grounds generally applicable to the class, thereby making appropriate final

injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R.

Civ. P. 23(b)(2).  "Under this rule, two elements must exist:  (1) the defendant's action or refusal

to act must be 'generally applicable to the class'; and (2) plaintiffs must seek final injunctive

relief or corresponding declaratory relief on behalf of the class."  *Disability Rights Council of*

*Greater Wash. v. Wash. Metro. Area Transit Auth.*, 239 F.R.D. 9, 28 (D.D.C. 2006) (quoting

*Bynum,* 217 F.R.D. at 48).

Here, both elements are present.  First, plaintiffs allege a wage practice that defendants

follow to the detriment of all members of the class – if a defendant employs a class member to

perform eviction services on a day-laborer basis, he or she receives a suppressed wage (or

sometimes no wage at all), most typically a flat rate of five dollars per eviction.  (Am. Compl. ¶

19

61; *see also* Ex. B, Eight-Seven Employee Affidavits.)  Second, plaintiffs have requested injunctive relief in their complaint to force defendants to pay all class members at least the lawful minimum wage and to cease current agreements and prevent future conspiracies to suppress wages.  (Am. Compl. ¶¶ 119, 130, 136, 142, 145, 148.)  Therefore, the proposed class satisfies both requirements of Rule 23(b)(2), and certification is proper.

        (b)    <u>Rule 23(b)(3):  The Proposed Class Is A Proper Damages Class Because Common Questions Of Liability And Damages Predominate Over Individual Questions Of Damages And A Class Action Is A Superior Method For Adjudication Of The Class Members' Claims.</u>

Certification of the proposed class is likewise proper under Rule 23(b)(3) because there are "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and for the claims at issue, "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  The proposed class satisfies both requirements.  First, common questions of minimum wage and antitrust liability, as well as class-wide damages determinations, predominate over questions of individual damages.  Second, a class action is a superior method for the just and efficient adjudication of this matter because it is unlikely that class members will be able to seek relief through other means.

        (i)    <u>Common Questions Of Law And Fact Regarding Liability And Damages Predominate Over Individual Damages Issues.</u>

The first prong of the Rule 23(b)(3) requirement can be satisfied even where individual class members may have incurred damages in varying amounts, if, as is the case here, the issues common to all class members predominate over the individualized ones. In general, a class will satisfy the predominance test where "there exists generalized evidence which proves or disproves

an element on a simultaneous, class-wide basis, since such proof obviates the need to examine

each class member's individual positions." *Vitamins*, 209 F.R.D. at 262 (quoting *In re Potash*

*Antitrust Litig.,* 159 F.R.D. 682, 693 (D. Minn. 1995)).  Here, the proposed class satisfies the

predominance requirement because issues of liability, the appropriateness of injunctive relief,

and damages will turn on issues of law and fact common to all members of the proposed class

rather than on the individualized circumstances of class members.  (*See* Am. Compl. ¶¶ 87-113,

143-145; Ex. B, Eighty-Seven Employee Affidavits.)

> (ii)    A Class Action Is Superior To Any Other Method
>         Of Resolving The Class Members' Claims.

Rule 23(b)(3) also requires that class resolution must be "superior to other available

methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3) establishes four

factors that bear upon the superiority determination.  The first factor is the interest of each

member in individually controlling the prosecution or defense of separate actions.  Fed. R. Civ.

P. 23(b)(3)(A).  Where damages suffered by each putative class member are not large, this factor

weighs in favor of certifying a class action, especially when it appears likely that individuals will

be unable to pursue their claims on an individual basis because the cost of doing so exceeds any

recovery they might obtain.  *Phillips Petro. Co. v. Shutts,* 472 U.S. 797, 809 (1985) (explaining

that an advantage to class actions is that they permit plaintiffs "to pool claims which would be

uneconomical to litigate individually").  In this action, individual recovery is likely to be more

than nominal but not so large that individuals would be likely to incur the costs associated with

individual representation to pursue their claims.  This consideration is exacerbated by the fact

that most prospective class members are homeless or formerly homeless and therefore may not

have the means of even an average citizen to acquire legal representation.  That ninety-four of

defendants' employees have chosen to become plaintiffs or have submitted affidavits without

pursuing individual claims also indicates a preference among class members to have their claims vindicated in a multi-plaintiff or class type of proceeding. Realistically, a class action is probably the only means most class members have to vindicate their right to minimum wage and pursue these claims. Therefore, class members have more interest in a class-wide resolution of these claims than in a series of individual adjudications.

The second factor of the superiority examination is "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." Fed. R. Civ. P. 23(b)(3)(B). The Settling Parties are aware of no other lawsuits that assert the minimum wage, antitrust, and equitable claims that are the basis of this action.

The third factor of the superiority test is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). While class members have worked at locations throughout the District of Columbia and its Maryland and Virginia suburbs, the District of Columbia is the epicenter of the alleged activity, including the largest number of evictions performed, the location of the majority of the pick-up locations, and the most flagrant minimum wage violations (considering the District's higher hourly minimum wage and daily four hour minimum). (Am. Compl. ¶¶ 35-37, 52-59.) Additionally, most of the named plaintiffs, most of the so-far identified class members, and many of the defendants reside in this district. (Am. Compl. ¶¶ 5-7, 8-12, 18, 26; Ex. B, Eighty-Seven Employee Affidavits.) Hence, it is desirable to concentrate this litigation in the District of Columbia.

The fourth factor, which in the broader class certification context considers "the difficulties likely to be encountered in the management of a class action," Fed. R. Civ. P. 23(b)(3)(D), need not be considered presently. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)

("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").  Given the narrow focus of the action, the shared factual predicate of the claims, the shared remedies for the class members, and the realistic unavailability of any other option for class members to pursue their claims, the proposed class is sufficiently cohesive to justify certification under Rule 23(b)(3).

Because the settlement class meets the requirements of Rule 23, the Court should certify the class for purposes of settlement.

C.    The Court Should Order That Notice Be Given To The Class.

1.    The Proposed Notice Plan Is Crafted To Ensure The Best Notice Practicable Given The Class's Unique Characteristics.

Rule 23(c)(2)(B) requires that "the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  In view of the special character and circumstances of the proposed class members in the current case, most of whom are without a permanent residence or mailing address, it is not practicable to identify and send individual notices to all persons entitled to receive notice.  To overcome that difficulty, the plaintiffs propose providing notice by publication in two local newspapers and by distribution through third-party organizations that provide services to the homeless, as set forth below.

First, plaintiffs will cause notice to be published in the following publications:  *Street Sense*, a newspaper dedicated to issues related to homelessness, and *Express*, a free daily publication of *The Washington Post*.  *Street Sense* is published semimonthly, and plaintiffs will place the notice in the first edition of *Street Sense* possible upon the Court's order approving certification and notice.  The *Express* is published daily, and plaintiffs will place the notice in the

23

paper on three consecutive days, commencing within twenty-one days of the Court's order approving certification and notice.  Plaintiffs' counsel has chosen these two newspapers because they are widely read and widely discussed in the homeless community.  (*See* Ex. J, Affidavit of Michael Stoops, Acting Director, National Coalition for the Homeless ¶ 3; Ex. K, Affidavit of Laura Thompson Osuri, Executive Director, *Street Sense* ¶¶ 3-5.)

The form and content of the notice to be published in these papers will be as set forth in Ex. C-1, Newspaper Notice.  The size of the published notice in each paper will be approximately two standard newspaper columns in width and six inches in length.  This published notice is an abbreviated notice intended primarily to make class members aware of their potential rights and direct them to any of three sources where they may gain further explanation of the case and obtain a copy of the "long form" notice:  Cleary Gottlieb (counsel for named plaintiffs), a website hosted by Cleary Gottlieb, or the National Coalition for the Homeless (a District-based homeless advocacy organization that has volunteered to distribute copies of the long form notice to anyone who requests it).

Second, plaintiffs will cause 4,000 flyers to be printed.  Plaintiffs will cause these flyers to be displayed prominently at area soup kitchens, shelters, medical clinics, outreach centers and other community organizations that serve the homeless.  Plaintiffs will also cause these flyers to be distributed on no less than three occasions, on different days of the week, at locations known to be used by defendants as pick-up points for eviction workers.

The form and content of these flyers will be as set forth in Ex. C-2, Flyer Notice/Short Form Notice.  These flyers will be a "short form" notice intended primarily to make class members aware of their potential rights and direct them to any of three sources where they may

gain further explanation of the case and obtain a copy of the "long form" notice:  Cleary

Gottlieb, a website hosted by Cleary Gottlieb, or the National Coalition for the Homeless.

Third, plaintiffs will cause notice to be sent by first class mail to all individual class

members for whom plaintiffs' counsel can obtain a separate home address through reasonable

efforts, including individuals who have already provided information, (*see generally* Ex. B,

Eighty-Seven Employee Affidavits), and those individuals for whom defendants produce names

and addresses from their payroll records.

The form and content of mailed notice will be as set forth in Exhibit C-3, Mail/Long

Form Notice.  This form of notice is intended to be the "long form" of notice, which fully

informs class members of their rights in relation to this litigation.

Fourth, plaintiffs will send by electronic mail to third-party organizations in the D.C.

Metro Area that regularly provide assistance to the homeless a copy of the notices set forth at

Exhibits C-2 and C-3, along with a request that they disseminate the information in the notice to

their clients.  A list of the organizations to whom plaintiffs will send this notice by electronic

mail is set forth at Exhibit D, A List of the Organizations to whom Plaintiffs Will Send This

Notice by Electronic Mail.

Fifth, plaintiffs will cause a website to be created hosting the notice.  Although few class

members own their own computers or have dedicated Internet access at home, most are able to

access the Internet through computers at homeless service organizations and public facilities,

such as D.C. public libraries.  (*See* Ex. J, Stoops Aff. ¶ 6.)

Sixth, plaintiffs' counsel will hold no fewer than three information sessions at homeless

service organizations and shelters where defendants have been known to collect eviction

workers.  At these sessions plaintiffs' counsel will provide information, answer questions,

25

distribute flyers, and provide long-form notices, upon request.  The anticipated locations of these sessions are set forth in Exhibit E, The List of Kitchens and Shelters for Info Sessions.

Under the circumstances, the proposed plan is the best notice practicable.  Plaintiffs will blanket the locations in the city where class members are most likely to be found with information about this case.  A leading advocate for the homeless and an expert in communicating with the homeless agree that this plan utilizes the most effective means possible to notify the population of mostly homeless class members regarding their rights in this litigation. (*See* Ex. J, Affidavit of Michael Stoops, Acting Director, National Coalition for the Homeless ¶ 9; Ex. K, Affidavit of Laura Thompson Osuri, Executive Director, *Street Sense*, ¶ 6.)

2.      Content Of The Proposed Notice.

As noted above, the plaintiffs propose a variety of notice forms to ensure that the greatest number of class members receive notice as is reasonably possible.  The proposed notice will advise class members of their rights with respect to this litigation, including a brief description of the allegations in the case and what steps each class member is entitled to take with respect to the claims.  For the contents of the proposed notice, please see Exhibits C-1, C-2, and C-3.

3.      Opt-Out Deadlines.

Plaintiffs propose that the Court permit class members to opt-out of the settlement until sixty days after notice is issued.  Sixty days constitute a typical class notice period.  *See, e.g., Bynum v. Gov't of Dist. of Columbia*, 384 F. Supp. 2d 342, 344 (D.D.C. 2005) (sixty-day notice period).

4.      Payment For Notice Expenses Should Be Authorized From The Settlement Fund.

The plaintiffs respectfully request that the Court approve payment for expenses associated with providing notice to the class from the settlement fund being paid by the A 1

Defendants.  Based on plaintiffs' proposed notice plan, it is anticipated that these expenses will amount to approximately $3,000, the amount needed to pay for publication in the *Express* and *Street Sense* newspapers.  Payment for notice expenses from a settlement fund is common in class action settlements.  *See, e.g.*, *Bynum v. Dist. of Columbia*, 412 F. Supp. 2d 73, 75 (D.D.C. 2006) (ordering that costs of class notice and administration be paid out of the settlement fund). Indeed, the Settling Parties stipulated in the Agreement itself that payment of such from the fund would be appropriate.  (Agreement ¶ 5.)  Furthermore, approval of such a use of the settlement fund is particularly appropriate here, where the plaintiffs themselves, being primarily homeless people who have been paid less than the wages they deserve, lack their own financial resources to pay for publication expenses.

> D.    <u>The Court Should Schedule A Fairness Hearing And A Schedule For Submission Of Objections And Responses.</u>

The Settling Parties believe that the means of providing notice as described in the Class Certification Memorandum can be fully accomplished within sixty days of receipt of the Court's orders of preliminary approval and class certification.  The Settling Parties further respectfully submit that members of the plaintiff class be given until the end of the notice period to submit comments or objections to the proposed settlement after the close of the notice period and that the Settling Parties be given fourteen days after the filing deadline for comments and/or objections of class members to file appropriate responses.  The Settling Parties respectfully request that the Fairness Hearing be scheduled at a reasonable time after the Settling Parties' deadline for responses to the class members' comments or objections.

<u>CONCLUSION</u>

For the reasons stated above, the Court should preliminarily approve the Settling Parties'

Agreement, certify the proposed class, order the proposed notice, approve a disbursement from

the settlement fund to pay for notice, and schedule the proposed fairness hearing.


Dated:  March 30, 2007                              Respectfully submitted,

**CLEARY GOTTLIEB STEEN &**             **MEYERS, RODBELL & ROSENBAUM,**
**HAMILTON LLP**                        **P.A.**


   /s/ Lee F. Berger                          /s/ Gina Smith, with permission/LFB
     Lee F. Berger (D.C. Bar # 482435)          Gina Smith (D.C. Bar # 449353)
     Matthew D. Slater (D.C. Bar # 386986)      6801 Kenilworth Avenue
     Larry C. Dembowski (D.C. Bar # 486331)     Suite 400
     2000 Pennsylvania Avenue, N.W.             Riverdale Park, MD 20737-1385
     Suite 9000                                 Tel: (301) 699-5800
     Washington, D.C.  20006                    Fax: (301) 779-5746
     Tel: (202) 974-1646
     Fax: (202) 974-1999                    ATTORNEY FOR DEFENDANTS A 1
                                            EVICTION SERVICES, INC. AND TANYA
ATTORNEYS FOR PLAINTIFFS                    SMITH