# EXHIBIT O

DEPOSITION OF IRWIN STATEN
CONDUCTED ON FRIDAY, DECEMBER 28, 2007

1 (Pages 1 to 4)

## Page 1

```
  1      IN THE UNITED STATES DISTRICT COURT
  2           FOR THE DISTRICT OF COLUMBIA
  3
  4   -----------------*
  5   HARRY JAKEYIA ASHFORD, et al.,  *
  6         Plaintiffs,    *
  7   vs.              *  Civil Action
  8   EAST COAST EXPRESS EVICTION,   *  No. 06cv1561
  9   et al.,              *
 10         Defendants.    *
 11   -----------------*
 12        Deposition of IRWIN STATEN
 13           Washington, D.C.
 14        Friday, December 28, 2007
 15              9:44 a.m.
 16
 17
 18
 19
 20   Job No. 1-118166
 21   Pages 1 - 204
 22   Reported by: Karen Young
```

## Page 2

```
  1      Deposition of IRWIN STATEN, held at the
  2   offices of:
  3      CLEARY GOTTLIEB STEEN & HAMILTON, LLP
  4      2000 Pennsylvania Avenue, Northwest
  5      Ninth Floor
  6      Washington, D.C. 20006-1801
  7      (202) 974-1500
  8
  9
 10
 11
 12      Pursuant to notice, before Karen Young,
 13   Notary Public of the District of Columbia.
```

## Page 3

```
  1            APPEARANCES
  2   ON BEHALF OF THE PLAINTIFFS:
  3      LEE F. BERGER, ESQUIRE
  4      MICHAEL R. HARTMAN, ESQUIRE
  5      JANE S. NEWPORT, ESQUIRE
  6      CLEARY GOTTLIEB STEEN & HAMILTON, LLP
  7      2000 Pennsylvania Avenue, Northwest
  8      Ninth Floor
  9      Washington, D.C. 20006-1801
 10      (202) 974-1853
 11
 12
 13
 14   ON BEHALF OF BUTCH ENTERPRISES AND THE WITNESS:
 15      DAVID E. FOX, ESQUIRE
 16      DAVID E. FOX & ASSOCIATES
 17      1325 18th Street, Northwest, Suite 103
 18      Washington, D.C. 20036
 19      (202) 955-5300
```

## Page 4

```
            CONTENTS
   EXAMINATION OF IRWIN STATEN               PAGE
      By Mr. Berger ................. 6
      By Mr. Fox .................... 200
      By Mr. Berger ................. 201
```

DEPOSITION OF IRWIN STATEN
CONDUCTED ON FRIDAY, DECEMBER 28, 2007

7 (Pages 25 to 28)

Page 25

1   A.   I meant that when we started, that's what
2   the other companies were paying.
3   Q.   And how did you know what the other
4   companies were paying?
5   A.   We did a survey, called around.
6   Q.   So you called around to the other eviction
7   companies and you asked them how much are you paying
8   eviction workers; is that correct?
9   A.   No, we didn't ask eviction companies. We
10  talked to some of the guys on the street.
11  Q.   And by guys, you mean eviction workers; is
12  that correct?
13  A.   Yes.
14  Q.   Did you ever talk to other eviction
15  companies about how much they were paying?
16  A.   No.
17  Q.   So you mentioned that Otto Hines and Derrick
18  Gaskins made hiring and firing decisions. Were they
19  drivers for you?
20  A.   Yes.
21  Q.   Do you ever -- or I'm sorry, you did already
22  mention that you also drive yourself sometimes; is

Page 26

1   that correct?
2   A.   Yes.
3   Q.   Is there anyone else besides yourself,
4   Mr. Hines and Mr. Gaskins who drives for Butch
5   Enterprises?
6   A.   No.
7   Q.   I apologize for having to confirm this.
8   A.   You mean at that time? What time are you
9   speaking of?
10  Q.   Well, I think -- please correct me if I'm
11  wrong, but I understand that Mr. Hines is now
12  deceased; is that correct?
13  A.   Yes.
14  Q.   And could you please confirm the date on
15  which he was deceased or approximately, if you know?
16  A.   September of this year.
17  Q.   Okay. So Mr. Gaskins continues to be your
18  driver; is that correct?
19  A.   Yes.
20  Q.   Have you hired anyone to replace Mr. Hines?
21  A.   Yes.
22  Q.   And who have you hired to replace Mr. Hines?

Page 27

1   A.   It's Willie Kelley.
2   Q.   Do you know Mr. Kelley's address?
3   A.   I don't off the top of my head.
4   Q.   Do you know his telephone number?
5   A.   No, I don't. Off the top of my head I
6   don't.
7   Q.   How do you usually contact Mr. Kelley?
8   A.   Call him by phone.
9   Q.   Okay. Do you have any office workers that
10  work at the Butch Enterprises office?
11  A.   My wife.
12  Q.   Are there any others?
13  A.   No.
14  Q.   Do you have Mr. Kelley's cell phone number?
15  A.   I don't have it on me, no.
16  Q.   Okay. And could you describe briefly your
17  wife's responsibilities as an office worker for Butch
18  Enterprises?
19  A.   She takes messages and writes down work
20  orders.
21  Q.   So besides performing evictions, does Butch
22  Enterprises do any other types of work?

Page 28

1   A.   Yes.
2   Q.   What other types of work does Butch
3   Enterprises do?
4   A.   Debris removal.
5   Q.   Is debris removal the same thing as like
6   trash-out?
7   A.   Yes.
8   Q.   Approximately what percentage would you say
9   of your work is evictions versus debris removal?
10  A.   It would be a guess.
11      MR. FOX: Don't guess. The answer is do not
12  guess.
13  BY MR. BERGER:
14  Q.   Based on your experience over the last year,
15  2007, working with Butch Enterprises, how many
16  evictions have you performed?
17  A.   I couldn't tell you.
18  Q.   Can you tell me approximately how many
19  you've performed?
20  A.   No.
21  Q.   Do you perform evictions in the District of
22  Columbia?

**Page 45**

1  documents I'm talking about?
2  A.  I think I do.
3  Q.  Okay. You just described to us a certain
4  document which I think you referred to as a payroll
5  document that you have the members of the crew sign
6  that has their name, address and social security
7  number on; is that correct?
8  A.  That's correct.
9  Q.  Okay, so those payroll documents you've
10 created for each crew that you've hired since
11 September 5th, 2006; is that correct?
12 A.  Yes.
13 Q.  And you have not retained any document
14 except for the documents that you have produced in
15 this litigation; is that correct?
16 A.  That's correct.
17 Q.  Okay. And how long have you been creating
18 those forms, those payroll forms?
19 A.  Every time we go out on a job, we use it.
20 Q.  Since March 1999?
21 A.  Yes.
22 Q.  Okay. So how many individual workers has

**Page 46**

1  Butch Enterprises hired since September 5th, 2002?
2  A.  I don't know.
3  Q.  Would you say that it's more than 50?
4      MR. FOX:  Objection.
5  BY MR. BERGER:
6  Q.  You can answer.
7  A.  I don't know, I don't know.
8  Q.  Okay. Since September 5th, 2002, have you
9  performed more than a thousand evictions do you think?
10 A.  I don't know.
11 Q.  What time do your eviction crews start
12 working on the days that they're hired?
13 A.  The time varies.
14 Q.  Okay. Well, what --
15 A.  There's no specific time.
16 Q.  What factors influence when the crew will
17 start working?
18 A.  The time of the eviction.
19 Q.  And who schedules the time of the eviction?
20 A.  The U.S. marshal.
21 Q.  Would that be the sheriff in Prince George's
22 County?

**Page 47**

1  A.  Yes.
2  Q.  When you or your drivers hire eviction
3  workers, do you tell them that you're Butch
4  Enterprises?
5  A.  No, they don't ask.
6  Q.  Do you ever tell them -- do you ever give
7  them a different name for a company besides Butch
8  Enterprises?
9  A.  No.
10 Q.  From N and First Street or N and Second
11 Street, wherever -- where you pick up the eviction
12 workers, how long on average does it take you to drive
13 to an eviction site in the District of Columbia?
14     MR. FOX:  Objection.
15 BY MR. BERGER:
16 Q.  Answer the question if you can.
17     MR. FOX:  Can you?
18 A.  How long does it take to drive to an
19 eviction site?
20 Q.  Yes.
21 A.  Ten minutes. Ten, 15 minutes.
22 Q.  How about how long it takes to drive to an

**Page 48**

1  eviction site in Prince George's County.
2  A.  Depends where it's located.
3  Q.  Can you give me a range?
4  A.  No. We don't -- and it depends on the
5  driver, you know, how well he knows where he's going.
6  I don't know.
7  Q.  Do you require the employees to ride in the
8  van to go to the eviction site?
9  A.  Yes.
10 Q.  If you've hired a crew to work on multiple
11 evictions --
12     MR. FOX:  Well, let me just say something
13 for the record. Before we agree that "hired" and
14 "fired" for convenience not refer to an employment
15 situation, it could refer to independent contractors,
16 to the word which we now used, which was "employees,"
17 should we use the same. It doesn't mean employees or
18 independent contractors. Just for convenience, you're
19 using that word "employees," because otherwise I have
20 to object every time.
21     MR. BERGER:  I will try to use the term
22 "eviction workers." If I say "employee," I mean

DEPOSITION OF IRWIN STATEN
CONDUCTED ON FRIDAY, DECEMBER 28, 2007

15 (Pages 57 to 60)

**Page 57**

1  you pay eviction workers more than five dollars per
2  eviction; is that correct?
3      A.  No.
4      Q.  What other instances do you pay people more
5  than five dollars per eviction?
6          MR. FOX:  Well, objection.  He's already
7  given you examples based on difficulty.  Is that what
8  you're asking?
9  BY MR. BERGER:
10     Q.  Well, he's given me one example -- please
11 answer the question if you can.
12         MR. FOX:  Well, I'll state an objection.
13 You can't ask the same question twice because you
14 don't understand.  He gave an answer based on
15 difficulty.  That's his answer.
16 BY MR. BERGER:
17     Q.  Besides the length of time -- with the
18 exception of the evictions that take over an hour, are
19 there any other instances in which it take -- in which
20 you pay people more than five dollars per eviction?
21     A.  It's just difficulty on the job.  If you go
22 to a place, they don't have any elevators, you have to

**Page 58**

1  walk steps.
2      Q.  And how often would you say the difficulty
3  of the eviction requires payment of five dollars --
4  more than five dollars per eviction?
5      A.  Not too often.
6      Q.  Okay.  Would you say it's in that same range
7  that you gave before, once or twice a year?
8      A.  Yes.
9      Q.  Okay.  And so besides the length of eviction
10 and difficulty, are there any other factors that might
11 make you pay more than five dollars per eviction?
12     A.  I can't think of any.
13     Q.  Thank you.  Do you also pay five dollars per
14 eviction for a two-bedroom apartment?
15     A.  Yes.
16     Q.  Is it five dollars per eviction regardless
17 of the size of the premises?
18     A.  Yes.
19     Q.  Have you ever heard the term used in paying
20 eviction workers a package deal?
21     A.  Yes.
22     Q.  Could you describe what a package deal is?

**Page 59**

1      A.  A package deal is if you have multiple size
2  apartments, say, one-, two-, three-bedrooms, each
3  apartment you have to have a certain amount of men.
4  Up to a three-bedroom, you have to have 20 people, so
5  you use the 20 people on every job no matter if it's a
6  one or a two, and you -- even though you don't need
7  them, and you guarantee them X amount of dollars.
8      Q.  So if I can then lay out an example based on
9  what you just said, if you at the beginning of the day
10 had a three-bedroom apartment, then you had a
11 one-bedroom apartment later, you would hire you say 20
12 people to perform the three-bedroom apartment
13 eviction, and then would all 20 people perform the
14 one-bedroom apartment eviction or do you only use the
15 ten required?
16     A.  They would perform the one, but there would
17 be more than two.
18     Q.  Okay, so in that example, with the
19 qualification that you've said that usually you have
20 more than two per day --
21         MR. FOX:  It was a three-bedroom followed by
22 a one-bedroom.

**Page 60**

1  BY MR. BERGER:
2      Q.  Three-bedroom followed by a one-bedroom.
3  How much would the package deal be for that?
4      A.  I don't know.
5      Q.  Okay.  Well, just please describe the
6  scenario -- the last scenario that you remember where
7  you've used the package deal.
8          MR. FOX:  Objection.  If he's used it.  I
9  mean, you said this was a term.  You didn't ask
10 whether his company uses it.
11 BY MR. BERGER:
12     Q.  Have you ever used a package deal before?
13     A.  Yes.
14     Q.  Okay.  Can you please describe the last
15 scenario you remember where Butch Enterprises used a
16 package deal?
17     A.  I have to think back when that was.  It's
18 been a while.  Five jobs and we had some one- and
19 two-bedrooms.  I don't know how many ones, I don't
20 know how many twos, but I had 12 men and we did them
21 all within an hour, they got $25.
22     Q.  So how does that differ from your normal

61

1  practice, which is five dollars per eviction, since
2  you said there were five evictions to perform and I
3  paid them $25?
4      MR. FOX: Objection. What do you mean,
5  how's that differ? He's told you what it costs for
6  normal and now he's told you what it costs for this
7  one. That's your answer.
8  BY MR. BERGER:
9     Q.   Can you answer the question? Would you like
10 me to repeat the question?
11    A.   It doesn't differ.
12    Q.   Okay, so when you use a package deal, you
13 are still paying workers five dollars per eviction; is
14 that correct?
15     MR. FOX: Objection.
16    A.   Well, I did that time.
17    Q.   Are there ever instances in which you do not
18 pay people five dollars per eviction for a package
19 deal?
20    A.   That's hard to say.
21    Q.   Do you remember any instance of a package
22 deal in which you paid people differently than five

62

1  dollars per eviction?
2     A.   They've gotten more.
3     Q.   So you can remember instances in which in a
4  package deal people got more than five dollars per
5  eviction.
6     A.   I couldn't tell you exactly when, but yes.
7     Q.   Do you ever remember any instance in which
8  people got less than five dollars per eviction --
9     A.   No.
10    Q.   -- for a package deal?
11    A.   No.
12    Q.   Have you ever heard of any of your
13 competitors using a package deal?
14    A.   Yes.
15    Q.   Specifically have you heard of East Coast
16 Express Evictions using a package deal?
17    A.   Not that specifically, but I've just heard
18 of people have done it.
19    Q.   And what do you understand other eviction
20 companies have done for package deal?
21    A.   What have they done?
22     MR. FOX: Objection. You can answer if you

63

1  know.
2  BY MR. BERGER:
3     Q.   Do they pay less than or -- I'll rephrase
4  the question. Do you understand other eviction
5  companies pay less than five dollars per eviction when
6  using a package deal?
7     A.   I don't know what they pay.
8     Q.   Okay. Are employees paid -- I'm sorry. Are
9  eviction workers paid in cash?
10    A.   Yes.
11    Q.   Who pays the eviction workers at the end of
12 the day? Or I'm sorry. Let me restate the question.
13 Do you pay eviction workers at the end of the day?
14    A.   Yes.
15    Q.   Who pays the eviction workers at the end of
16 the day?
17    A.   The supervisor.
18    Q.   So either yourself if you're driving or
19 Mr. Gaskins or Mr. Kelley if they are driving; is that
20 correct?
21    A.   That's correct.
22    Q.   Do you give them the cash at the beginning

64

1  of the day to pay or do you get them the cash later in
2  the day?
3     A.   Later in the day.
4     Q.   Do the eviction workers have to wait at the
5  end of the day for you to meet up with the supervisor
6  in order to get the cash to pay them?
7     MR. FOX: Objection. Which day are we
8  talking about?
9     MR. BERGER: On the typical day.
10    MR. FOX: Is there a typical day?
11 BY MR. BERGER:
12    Q.   Do you understand the question?
13    A.   Yes. No.
14    Q.   So by the time the work has completed at
15 that last site, the supervisors have the money in hand
16 to pay the workers; is that correct?
17    A.   That's correct.
18    Q.   Do you part ways with -- on a typical day,
19 do you part ways with the eviction workers at the
20 location of the last site or do you drive them to some
21 other location?
22    A.   Sometimes they want to get paid at the site.

DEPOSITION OF IRWIN STATEN
CONDUCTED ON FRIDAY, DECEMBER 28, 2007

18 (Pages 69 to 72)

## Page 69

1  Q.  When you hire the eviction workers to
2  perform the evictions, the work they perform is
3  necessary for Butch Enterprises to carry out the
4  eviction; isn't that correct?
5  A.  Yes.
6  Q.  If you didn't hire eviction workers, would
7  Butch Enterprises be able to perform evictions?
8  A.  No.
9  Q.  Would you agree then that the eviction
10 workers' work is an indispensable part of performing
11 an eviction?
12     MR. FOX:  Objection.
13 A.  No.
14 Q.  It's not indispensable?
15 A.  No.
16 Q.  So you could perform the eviction then even
17 if you didn't have eviction workers; is that correct?
18     MR. FOX:  Objection.
19 A.  Are you speaking of specific people?
20 Q.  No, I'm talking about any eviction worker.
21 You had no eviction workers, then Butch Enterprises
22 could not perform an eviction; isn't that correct?

## Page 70

1  A.  No.
2  Q.  So if there were -- if you did not hire
3  eviction workers, how would you perform an eviction?
4  A.  They couldn't be done.
5  Q.  Okay.  And correct me if I'm wrong, but I
6  believe earlier you testified that Butch Enterprises
7  has the power to hire the eviction workers that it
8  wants; is that correct?
9  A.  What do you mean by power to hire as we
10 want?
11 Q.  Is it correct that Butch Enterprises sets
12 its own policy as to who it will hire?
13 A.  Yes.
14 Q.  In fact, I refer you to Exhibit 1, answer
15 number 9 on page 6 where the interrogatory was, for
16 number 9, "State the criteria used to decide whom to
17 hire as eviction workers," and the answer to number 9
18 was, "We prefer people who have worked with us
19 previously.  We say no to drinking, drugs, cursing and
20 stealing."  Did I read that correctly?
21 A.  Yes.
22 Q.  So Butch Enterprises has a policy

## Page 71

1  determining who it will hire to perform evictions; is
2  that correct?
3  A.  Yes.
4  Q.  And during the time that the eviction
5  workers are working for Butch Enterprises, Butch
6  Enterprises essentially controls their schedule; is
7  that correct?
8  A.  No, we don't.
9  Q.  Does Butch Enterprises determine when they
10 will be performing evictions?
11 A.  We say when we're going to do the job, yes,
12 but they come and go as they want.
13 Q.  Would you pay them if they didn't come and
14 go at the time that the eviction was occurring?
15 A.  No.
16 Q.  So as a condition of their employment, a
17 condition of them getting paid, the eviction workers
18 must perform the evictions at the time that Butch
19 Enterprises instructs them; is that correct?
20     MR. FOX:  Objection to the word
21 "employment."
22     MR. BERGER:  I will restate the question.

## Page 72

1     MR. FOX:  And what was your last part of it?
2  That's really all you need.  What was the last part of
3  it?
4  BY MR. BERGER:
5  Q.  I'll restate the question.  So as a
6  condition of the eviction workers working for Butch
7  Enterprises getting paid for Butch Enterprises, the
8  eviction workers must perform the evictions at the
9  time that Butch Enterprises instructs them to; is that
10 correct?
11     MR. FOX:  Objection.  He said he doesn't set
12 the times, so don't take words that are not previously
13 in evidence.
14 BY MR. BERGER:
15 Q.  Is that correct what I just said?
16 A.  No, because if I set a job, if I have on my
17 paper that a job is at 11:00, it may be done at 9:00.
18 If I have a job at 10:00, it might be at 3:00, it
19 might be done at 9:00.  So when the marshals call us
20 to say that they're ready to do the job, that's when
21 we come.
22 Q.  So in that circumstance where the eviction's

### Page 77

1  A.  No, if the marshal says I can't, I can't.
2  Q.  Before the evictions then Butch Enterprises
3  does perform, Butch Enterprises instructs the eviction
4  workers what time that eviction will occur; is that
5  correct?
6  A.  For -- say that again.
7  Q.  For evictions that Butch Enterprises does
8  perform, Butch Enterprises instructs the eviction
9  workers when the eviction will be performed.
10  **A.  We all get our instructions from the**
11  **marshals.**
12  Q.  So Butch Enterprises does not instruct the
13  eviction workers as to when the eviction will occur.
14  **A.  That's correct.**
15  Q.  So when you hire an eviction worker, you do
16  not instruct them what time the eviction will occur?
17      MR. FOX: Objection. He just said he got
18  the instructions from the marshals. It's the same
19  question.
20      MR. BERGER: It's not the same question.
21      MR. FOX: You should ask him a question
22  once, not try to get a different answer by rephrasing

### Page 78

1  it.
2  BY MR. BERGER:
3  Q.  Can you answer the question please?
4  **A.  What is it again?**
5      MR. BERGER: Can you please read back the
6  question?
7          - - -
8      THE REPORTER: Question: "So when you hire
9  an eviction worker, you do not instruct them what time
10  the eviction will occur?"
11          - - -
12  **A.  No, I never ever do.**
13  Q.  Who instructs the eviction workers to get
14  off the van and start the eviction?
15  **A.  Marshals.**
16  Q.  Does Butch Enterprises ever negotiate with
17  workers as to how much they will be paid?
18  **A.  No.**
19  Q.  So Butch Enterprises unilaterally decides
20  how much workers will be paid; is that correct?
21  **A.  Yes.**
22  Q.  So you mentioned before a situation in which

### Page 79

1  Butch Enterprises shows up to perform an eviction but
2  the eviction is cancelled; is that correct?
3  **A.  Say that again?**
4  Q.  There are instances in which Butch
5  Enterprises shows up to perform an eviction but the
6  eviction is cancelled before you actually perform the
7  eviction; is that correct?
8  **A.  That's correct.**
9  Q.  Could you give some examples of why
10  evictions are cancelled?
11      MR. FOX: Objection. This has been asked
12  and answered and we do not intend to let you ask and
13  answer the same thing all day long just to use up the
14  seven hours. What he told you was sometimes people
15  move out, sometimes people pay. You're asking the
16  same question again. Please do not do it. Move on to
17  the next question. Don't answer. Next question,
18  Counsel. This is going to change right now.
19      MR. BERGER: Let's take a break for a few
20  minutes, go off the record. Thanks.
21      (Recessed at 11:23 a.m.)
22      (Reconvened at 11:33 a.m.)

### Page 80

1      MR. BERGER: Now, we've reviewed the
2  transcript, and certainly while Mr. Staten has
3  mentioned cancellation of evictions, he hasn't really
4  gone into the issues that you described in this
5  testimony today, so for the sake of completion, I'm
6  going to ask him some questions about the cancellation
7  of evictions.
8      MR. FOX: Please proceed.
9  BY MR. BERGER:
10  Q.  So can you please list reasons why evictions
11  are cancelled?
12  **A.  Job cancelled due to rain, could be**
13  **cancelled due to temperature, be cancelled because the**
14  **tenant paid, could be cancelled because the tenant**
15  **moved.**
16  Q.  In each of those circumstances, is Butch
17  Enterprises still paid?
18  **A.  No.**
19  Q.  Which of -- under which of those
20  circumstances is Butch Enterprises paid and which is
21  it not paid?
22  **A.  We're not paid for inclement weather, we're**

Page 93

1  A. No.
2  Q. What kind of records or forms does Butch
3  Enterprises maintain?
4  A. Only ones I keep for a certain amount of
5  time is the ones they put their name, address, social
6  on them. That's it.
7  Q. And who is in charge of maintaining these
8  files?
9  A. Me.
10 Q. Where are the files located?
11    MR. FOX: Assuming --
12 A. The ones that I might have?
13 Q. That's correct.
14 A. In my office.
15 Q. Does Butch Enterprises pay taxes?
16 A. Yes.
17 Q. Does anyone maintain records of Butch
18 Enterprises' taxes paid?
19 A. Taxes paid?
20 Q. Tax forms that you've submitted to the
21 government?
22 A. I would.

Page 94

1  Q. Do you maintain tax records?
2  A. Yes.
3  Q. How far back do you maintain tax records?
4  A. Going back two years, going back to '06.
5  Q. So just to be clear, are you talking about
6  the taxes paid for the 2006 year or are you talking
7  about the taxes paid for the 2005 year that you filed
8  in 2006?
9  A. 2006 year.
10 Q. Okay. And those are maintained in your
11 office; is that correct?
12 A. Yes.
13 Q. And what types of paperwork do you or your
14 drivers fill out besides the payroll forms we've
15 already discussed when overseeing an eviction, if any?
16 A. We fill out the -- a form of what time we
17 got there, what time we started, what time we left.
18 Q. Are there any others?
19 A. That's it.
20 Q. And where are those forms kept?
21 A. I have those that I've kept -- that I keep.
22 Q. And how far back do you keep them?

Page 95

1  A. Probably about a month.
2  Q. So any forms regarding evictions that
3  occurred between September 5th, 2006 and about a month
4  ago have not been retained; is that correct?
5  A. That's correct.
6  Q. Does Butch Enterprises keep records of the
7  dates of upcoming jobs?
8  A. We have no way of knowing upcoming jobs.
9  Q. How far in advance does a customer typically
10 contact you regarding performing an eviction?
11 A. A day, 24 hours.
12 Q. So when the customer contacts you, do you
13 maintain any kind of form regarding that contact?
14 A. No.
15    MR. BERGER: Okay. Will the court reporter
16 please mark these documents as -- we're at Exhibit 2?
17       - - -
18    (Deposition Exhibit Number 2 was marked for
19 identification.)
20       - - -
21 BY MR. BERGER:
22 Q. Please take a moment to review these

Page 96

1  documents. Could we go off the record for a minute?
2       - - -
3    (Discussion off the record)
4       - - -
5    MR. FOX: Defendant Butch stipulates to the
6  authenticity of Exhibit 2, which consists of nine
7  pages.
8    THE WITNESS: Ten.
9    MR. FOX: Ten? Okay, ten.
10    MR. BERGER: Do you also stipulate that they
11 are business records for purposes of the federal rules
12 of evidence?
13    MR. FOX: Yeah.
14    MR. BERGER: Thank you.
15    MR. FOX: Thank you.
16 BY MR. BERGER:
17 Q. So are these documents, which I'll refer to
18 as work order requests, because that's what's on the
19 top of the first page there --
20 A. That's correct.
21 Q. They appear to be computer printout
22 documents that are then filled in by hand by

DEPOSITION OF IRWIN STATEN
CONDUCTED ON FRIDAY, DECEMBER 28, 2007

25 (Pages 97 to 100)

97

1  supervisors; is that correct?
2     A.  Only the top part is filled out by me. The
3  bottom part is filled out by the supervisor.
4     Q.  Okay, thank you. And as far as the form
5  goes, not the part that's filled in by you and the
6  supervisor, just the form, who created that?
7     A.  I did.
8     Q.  Okay. And what's the purpose of this form?
9     A.  The purpose of the form is so they know
10 where they're going and what time -- the time on there
11 and we know what time we got there so no one can
12 dispute the time we got there and the time that we
13 left and who's supervising the job.
14    Q.  So do you fill out the top portion of this
15 work order request for every eviction you perform?
16    A.  Either me or my wife.
17    Q.  Okay, and does the supervisor fill out the
18 bottom portion for every eviction that's performed?
19    A.  Yes.
20    Q.  How long have you been using these forms?
21    A.  Since '06.
22    Q.  Had you started using them as of September

98

1  5th, 2006?
2     A.  September 5th? Before then. Probably
3  around February.
4     Q.  Okay. Before February 2006, were you using
5  a different form for the same purpose?
6        MR. FOX: Objection.
7     A.  I wasn't with the company.
8     Q.  I apologize, but I recall earlier you
9  testifying that you were the COO of the company as of
10 February 1999; is that correct?
11    A.  But I didn't always -- I didn't work for
12 them the whole time. There was a time when I left the
13 company.
14    Q.  Okay. When did you leave the company?
15    A.  '03 or '04 I left.
16    Q.  And so from the time that you left Butch
17 Enterprises to the time that you became the owner of
18 Butch Enterprises in February 2006, had you worked for
19 the company at all during that time?
20    A.  No.
21    Q.  What were you doing for employment during
22 that time?

99

1     A.  I worked for a company that did homeland
2  security in Silver Spring.
3     Q.  Okay, so it was not related to evictions; is
4  that correct?
5     A.  I didn't do evictions at all.
6     Q.  Okay. So during the period that you did
7  work for Butch Enterprises, were work order requests
8  similar to this used in that first period, the 1999 to
9  '03 or '04?
10    A.  Similar, yes.
11    Q.  Have any of those documents been retained
12 today?
13    A.  No.
14    Q.  Had they existed in February 2006 when you
15 came back to the company?
16    A.  Not that I know of.
17    Q.  Were there any records regarding information
18 contained in these work order requests, specifically
19 who the client was, where the eviction took place, the
20 time the eviction began and ended, who supervised, who
21 the marshal was, et cetera, were there any records
22 existing at the time that you took control of the

100

1  company in February 2006?
2     A.  No.
3     Q.  Who would know whether such records were
4  created during that time?
5        MR. FOX: Objection. How does he know what
6  other people know?
7     A.  I don't know.
8     Q.  So Mr. Campbell, C-A-M-P-B-E-L-L, correct?
9     A.  Yes.
10    Q.  He controlled the company until February
11 2006 when you purchased the company; is that correct?
12       MR. FOX: Objection. You can answer if you
13 know.
14    A.  I really don't know. I don't know.
15    Q.  Okay. Who did you buy the company from?
16    A.  He signed it over to me.
17    Q.  Okay, so Mr. Campbell is still alive?
18    A.  As far as I know.
19    Q.  Have you spoken to him since you received
20 the company from him?
21    A.  No, I haven't.
22    Q.  So after the supervisor fills out this work

Page 109

1 records; is that correct?
2   A.  **Defendant has only what?**
3   Q.  If you look at page 2, the third paragraph,
4 very end of the paragraph says, "Defendant has only
5 pay records." Is that correct?
6   A.  **On page 2.**
7   Q.  Page 2, the third paragraph from the top,
8 "Since each job is ad hoc, defendant has only pay
9 records." Does it say that?
10   A.  **What's ad hoc?**
11       MR. FOX: Counsel, you'll see on page 1
12 where it says defendant further states that the
13 language employed may be that of its attorney, so if I
14 use some fancy language, could you translate for him
15 what you're asking?
16 BY MR. BERGER:
17   Q.  I'm asking specifically if you look at that
18 last sentence, the last part of the sentence says,
19 "Defendant has only pay records." Do you see where it
20 says that?
21   A.  **Yes.**
22   Q.  Okay, so when you said "pay records" here,

Page 110

1 were you referring to the payroll records that we
2 discussed earlier?
3   A.  **Yes.**
4   Q.  Are there any other pay records besides
5 those payroll records that Butch Enterprises
6 maintains?
7   A.  **No.**
8       MR. BERGER: Okay. I'm going to ask the
9 court reporter to mark these as Exhibit 3. Oops,
10 sorry. This one.
11       - - -
12       (Deposition Exhibit Number 3 was marked for
13 identification.)
14       - - -
15 BY MR. BERGER:
16   Q.  Mr. Staten, please take a moment to review
17 these. Go off the record for a minute.
18       - - -
19       (Discussion off the record)
20       - - -
21       MR. FOX: Counsel, defendant agrees that
22 Exhibit 3, consisting of four pages, are authentic

Page 111

1 business records.
2 BY MR. BERGER:
3   Q.  Thank you, Mr. Fox. So do these payroll
4 forms indicate how much each person is paid per
5 eviction?
6   A.  **Yes. Well, no. You said per eviction.**
7 **This could be one. The first one, it could be one**
8 **job.**
9   Q.  So it would require you to have both the
10 payroll record and the work order to know how many
11 jobs each man was paid for; is that correct?
12   A.  **Say that again.**
13   Q.  I'll withdraw the question. Is it the
14 regular course -- is it the regular practice for the
15 supervisor to fill in kind of in the side here as we
16 see in these forms how much each man is paid?
17   A.  **Yes.**
18   Q.  Is it also the typical practice to write the
19 supervisor's name on the top of the form; is that
20 correct?
21   A.  **It's not a requirement that he do that.**
22   Q.  And the name, address, signature and social

Page 112

1 security number are filled out by the eviction worker;
2 is that correct?
3   A.  **By who?**
4   Q.  The eviction worker.
5   A.  **Yes.**
6   Q.  On the bottom of each of pages 1 through 3,
7 there appears to be something that was circled and
8 then blotted out. Do you see what I'm talking about,
9 in the bottom left-hand corner of pages 1 through 3.
10       MR. FOX: I think he's referring to this.
11 Does that appear to be something that you know to have
12 been blotted out, or you don't know?
13   A.  **I really don't know.**
14   Q.  Is it the regular practice at the bottom of
15 the form to write and circle something on the bottom
16 left of the form?
17   A.  **I mean, they would put what they need to put**
18 **in there. No, it's not regular practice, no.**
19   Q.  On page 1 of Exhibit 3, there appears to be
20 a four-letter word written on the bottom center right
21 of the page. I believe that it says "over." Do you
22 agree that's what it says?

121

1   MR. FOX: Well, let's take a minute because
2   -- let's take a little break here.
3   MR. BERGER: Okay. Can we go off the
4   record?
5       (Recessed at 12:27 p.m.)
6       (Reconvened at 12:31 p.m.)
7   MR. BERGER: Could you read back the last
8   question please?
9       - - -
10  THE REPORTER: Question: "What kind of
11  records do you maintain?"
12      - - -
13  THE WITNESS: For what?
14  BY MR. BERGER:
15  Q.  The question regarded Butch Enterprises'
16  gross revenue during any kind of time period.
17  A.  **What are they?**
18  Q.  No, do you -- you answered yes to a question
19  does Butch Enterprises maintain any kind of records
20  regarding the gross amount that Butch Enterprises
21  earns, and so I asked you what kinds of records do
22  they -- does Butch Enterprises maintain regarding

122

1   those gross amounts earned, and then you said that
2   information is privileged.
3   A.  **Yes.**
4   Q.  So my question is which privilege are you
5   invoking, or Mr. Fox, you can answer, which privilege
6   is your client invoking?
7   MR. FOX: If you're asking what the company
8   made, he's saying that's privileged because it's
9   irrelevant to the case. I mean --
10  MR. BERGER: Relevance is not --
11  MR. FOX: It gets you into another area.
12  It's a business secret.
13  MR. BERGER: That's not a privilege either.
14  If you're refusing to answer the question, we will go
15  to the court and compel the answer to the question.
16  MR. FOX: You shouldn't bother unless you
17  really need it, to be honest. I don't know why you
18  really need it.
19  BY MR. BERGER:
20  Q.  So are you refusing to answer the question?
21  MR. FOX: If his company made a million
22  dollars or ten dollars, what's the difference to the

123

1   case?
2   BY MR. BERGER:
3   Q.  Are you -- Mr. Staten, are you refusing to
4   answer the question?
5   A.  **My answer stands.**
6   Q.  Which is that you're not answering because
7   it's privileged.
8   A.  **Yes.**
9   Q.  Okay, so my question to you is which
10  privilege are you invoking.
11  A.  **Invoking a privilege that that information
12  is privileged, the information of how much my company
13  made.**
14  Q.  So it's not -- you're not invoking an
15  attorney-client privilege, are you?
16  MR. FOX: Well, objection. I'm not sure
17  he's qualified to talk about the legal definition of
18  attorney-client privilege. He told you what he's
19  saying.
20  BY MR. BERGER:
21  Q.  So you are refusing to answer the question;
22  is that correct? You're refusing to tell me what kind

124

1   of records Butch Enterprises maintains regarding its
2   gross revenue.
3   A.  **What do you mean by what kind of records do
4   we maintain or how much we made?**
5   Q.  I asked you if you -- I asked you if you,
6   Butch Enterprises, maintains records regarding the
7   gross amount that Butch Enterprises earns during any
8   period. You answered yes. I asked you what kinds of
9   records does Butch Enterprises maintain regarding
10  gross amounts.
11  A.  **What kind of records we maintain? How much
12  the client pays.**
13  Q.  So are you talking about invoices?
14  A.  **Yes.**
15  Q.  Okay. And how far back do you keep
16  invoices?
17  A.  **For a month.**
18  Q.  And those invoices state the -- do those
19  invoices state the address of the eviction that
20  occurred?
21  A.  **Oh, yes, they do. They do, the invoices,
22  yeah. I'm thinking of something else.**

DEPOSITION OF IRWIN STATEN
CONDUCTED ON FRIDAY, DECEMBER 28, 2007

32 (Pages 125 to 128)

125

1  Q. So the invoices are a separate document than
2  the documents in Exhibit 2 that are the work order
3  requests; is that correct?
4  A. Yes.
5  Q. But you have not produced any of the
6  invoices in this case; is that correct?
7  A. No.
8  Q. And you have been creating invoices since
9  September 5th, 2006; is that correct?
10 A. Yes.
11 Q. But you only maintain them back one month.
12 A. Well, you know, probably this last month,
13 they've just been slow in getting out because I have
14 been busy, but mainly when I do them, they're only
15 kept two days, one to two days, because they're out if
16 not that day, a couple days after that.
17 Q. Besides the invoices, are there any other
18 records that you maintain regarding Butch Enterprises'
19 revenue?
20 A. No.
21 Q. Are there any documents that you maintain
22 regarding Butch Enterprises' profit?

126

1  A. No.
2  Q. So when you -- do you use an accountant to
3  pay taxes?
4  A. Yes.
5  Q. What documents do you give your accountant
6  regarding how much Butch Enterprises has earned during
7  the year?
8  A. Everything is at a set amount. I know how
9  much gas we use, I know how much I paid my
10 supervisors, I know how much I pay for faxing, and so
11 I can just -- I mean, just one, two, three, so I just
12 put it down, average it out and I give it to him.
13 Q. So you know the total number of evictions
14 you perform in a year; is that correct?
15 A. No. That has nothing to do with it.
16 Q. What -- so you just tell him how much your
17 expenses were generally.
18 A. Yeah.
19 Q. How -- do you tell him what your income is?
20 A. Do I tell him what my income was? I tell
21 him what the company did, yes.
22 Q. Okay, and how do you know how much the

127

1  company earned?
2  A. Because I can generate that. I can find out
3  what the company did.
4  Q. How?
5  (The witness conferred with counsel.)
6  BY MR. BERGER:
7  Q. Now can you answer the question please,
8  Mr. Staten?
9  A. Can you repeat the question?
10 Q. Read back the question please. Actually,
11 don't read back the question. How do you generate the
12 amount of money that the company earns to give to your
13 tax accountant?
14 A. Give it to him on a ledger.
15 Q. A ledger. Do you maintain a ledger?
16 A. Yes.
17 Q. Do you know how much revenue Butch
18 Enterprises has had in 2007?
19 MR. FOX: Objection, relevancy.
20 BY MR. BERGER:
21 Q. Answer the question if you can.
22 A. No, I don't.

128

1  Q. Do you know how much Butch Enterprises
2  earned in any year between 2002 and today?
3  A. No.
4  MR. FOX: You understand that --
5  THE WITNESS: Off the top of my head.
6  MR. FOX: He's been in this company two
7  years. You're asking him about '02, which is how many
8  years ago?
9  BY MR. BERGER:
10 Q. Do you have any -- rephrase the question.
11 Do you know how much profit Butch Enterprises has made
12 in 2007?
13 A. No.
14 Q. Do you know if Butch Enterprises has made
15 over $50,000 in profit?
16 A. I would say no.
17 Q. Besides the payroll records, the work order
18 requests, the ledger and the invoices, does Butch
19 Enterprises create any other types of records?
20 A. No.
21 Q. Is the ledger in paper or electronic format?
22 A. Paper.

DEPOSITION OF IRWIN STATEN
CONDUCTED ON FRIDAY, DECEMBER 28, 2007

34 (Pages 133 to 136)

133

1 you to comply with all plaintiffs' document requests?
2   MR. FOX: Did you know you're supposed to
3 comply with the document request? Did you know that?
4   MR. BERGER: Actually, Mr. Fox, my question
5 was are you aware that the court has ordered you to
6 comply with plaintiffs' document requests.
7   (The witness conferred with counsel.)
8   THE WITNESS: I know I am supposed to
9 produce documents, but I don't know about which
10 paperwork.
11 BY MR. BERGER:
12   Q.   I don't understand what you mean by
13 paperwork. Can you please explain your answer?
14   A.   **Paperwork, documents.**
15   Q.   Are you familiar with the court's order
16 dated October 15th, 2007?
17   A.   **I don't remember.**
18   Q.   We'll get a copy of that and we'll get that
19 in a moment. Let's skip ahead to page 2, paragraph 4.
20 That says --
21   A.   **Exhibit 4?**
22   Q.   Yes, we're still in Exhibit 4, so paragraph

134

1 4 there. It says, "Within ten days of this order,
2 defendants shall pay to plaintiffs' counsel $28,516.58
3 in a money order cashier's check paid to Cleary
4 Gottlieb Steen & Hamilton, LLP, delivered to Larry C.
5 Dembowski at Cleary Gottlieb Steen & Hamilton, LLP,
6 2000 Pennsylvania Avenue, Northwest, Suite 9000,
7 Washington, D.C. two thousand six." Did I read that
8 correctly?
9   A.   **Yes.**
10   Q.   Before this deposition, were you aware that
11 within ten days of this order on -- which was filed on
12 December 14th, 2007, you had to pay plaintiffs'
13 counsel $28,516.58?
14   A.   **I don't remember.**
15   Q.   Are you now aware, having read this?
16   A.   **Yes.**
17   Q.   Thank you. Do you plan on complying with
18 that order?
19   A.   **I can't.**
20   Q.   Regarding paragraph number 2, which says,
21 "Within ten days of this order, Defendants Irwin
22 Staten and Butch Enterprises, Inc., defendants, shall

135

1 comply with this court's order dated October 15th,
2 2007 and within ten days of this order shall certify
3 to the court in writing such compliance." Do you
4 intend to comply with that order?
5   A.   **I can't.**
6   Q.   Why can't you comply with that order?
7   A.   **I don't have $28,000.**
8   Q.   Specifically paragraph 2 that I just
9 mentioned, do you intend to comply with the order to
10 comply with the court's order dated October 15th, 2007
11 and to certify to the court in writing that Butch
12 Enterprises and Irwin Staten have complied with that
13 order?
14   (The witness conferred with counsel.)
15   THE WITNESS: I don't know.
16   MR. BERGER: Okay, we'll come back to that
17 question. I'd like to mark this as Exhibit Number 5
18 please.
19   - - -
20   (Deposition Exhibit Number 5 was marked for
21 identification.)
22   - - -

136

1   MR. FOX: Is this the same document?
2   MR. BERGER: This is --
3   MR. FOX: Oh, this is just to a different
4 person.
5 BY MR. BERGER:
6   Q.   Please take a moment to review this
7 document, Mr. Staten. Mr. Staten, have you ever seen
8 this document before?
9   A.   **Yes.**
10   Q.   Could you please describe it?
11   A.   **Questions that were asked -- this document**
12 **asks me different questions and instructions.**
13   Q.   And have you ever responded to this request?
14   A.   **Yes.**
15   Q.   Have you served plaintiffs with a response
16 to this request?
17   A.   **Yes.**
18   Q.   Plaintiffs do not -- have not received any
19 responses to this request.
20   A.   **I'm sorry. Plaintiffs?**
21   Q.   Plaintiffs' attorneys, us.
22   A.   **Anything I had I gave to my attorney.**

DEPOSITION OF IRWIN STATEN
CONDUCTED ON FRIDAY, DECEMBER 28, 2007

35 (Pages 137 to 140)

---

**137**

1  Q. Okay. Plaintiffs have not received a copy
2  of this, so I would ask that -- would you be willing
3  to give us a copy of your responses to this first set
4  of interrogatories to Defendant Irwin Staten next
5  week?
6  **A. If my attorney has it.**
7     MR. FOX: You've got a bunch of documents
8  different from what I know about and what I've
9  received, so I'm not ready to answer.
10    MR. BERGER: Let's go back a moment then.
11 Could you please mark this as Exhibit 6?
12         - - -
13    (Deposition Exhibit Number 6 was marked for
14 identification.)
15         - - -
16 BY MR. BERGER:
17  Q. Mr. Staten, have you seen this Exhibit 6
18 before?
19  **A. I don't remember seeing it.**
20  Q. Having read this now, do you understand that
21 this order instructs you and Butch Enterprises to
22 comply with plaintiffs' first request for production

**138**

1  of documents from Butch Enterprises, plaintiffs' first
2  request for production of documents from Irwin Staten,
3  plaintiffs' first set of interrogatories to Butch
4  Enterprises, plaintiffs' second request for production
5  of documents from Defendant Butch Enterprises,
6  plaintiffs' second request for production of documents
7  from Defendant Irwin, plaintiffs' first set of
8  interrogatories to Defendant Irwin Staten, and
9  plaintiffs' third request for production of documents
10 and inspection of tangible things from Defendant Butch
11 Enterprises?
12  **A. I can read it.**
13  Q. In reading it --
14  **A. What documents are you requesting?**
15  Q. We'll go through specific document requests
16 in a moment, but my question is do you understand that
17 each of the requests that I just mentioned are -- I'm
18 sorry. Do you understand that this order requires you
19 and Butch Enterprises to comply with each of the
20 discovery requests that I just mentioned?
21  **A. Yes.**
22  Q. Okay. So going back now to Exhibit 5, do

**139**

1  you understand that the order in Exhibit 6 orders
2  Butch Enterprises -- I'm sorry, orders you
3  individually to comply with and produce answers to
4  Exhibit Number 5?
5  **A. Yes.**
6  Q. Thank you, but it is your testimony that you
7  do not know whether those answers have been served on
8  plaintiffs; is that correct?
9  **A. I do not know.**
10 Q. Do you ever recall verifying, signing a
11 final document verifying responses to these
12 interrogatories?
13 **A. Yes.**
14    MR. BERGER: Okay. I'll just say on the
15 record, Mr. Fox, plaintiffs have not received these
16 responses. To the extent you have them, we could
17 certainly forgo further motion practice by simply
18 serving them on us, or if you've already served them,
19 we've not received a copy and --
20    MR. FOX: We served a second set of
21 interrogatory answers. Documents we have are all
22 different from these, so we can't stop you from filing

**140**

1  further motions, but I'm going to take a minute next
2  week and figure out why our documents are different.
3     MR. BERGER: Please mark this as Exhibit 7.
4         - - -
5     (Deposition Exhibit Number 7 was marked for
6  identification.)
7         - - -
8  BY MR. BERGER:
9   Q. Mr. Staten, please review this Exhibit 7.
10    MR. BERGER: Mr. Fox, while your client is
11 reviewing that, do you want to take a lunch break
12 sometime soon?
13    MR. FOX: Let me ask you about a time
14 estimate.
15    MR. BERGER: Let's go off the record.
16         - - -
17    (Discussion off the record)
18         - - -
19    MR. BERGER: I'm going to introduce now a
20 few more documents, and Mr. Staten has agreed when we
21 take our lunch break that he'll review those during
22 the lunch break.

DEPOSITION OF IRWIN STATEN
CONDUCTED ON FRIDAY, DECEMBER 28, 2007

37 (Pages 145 to 148)

Page 145

1   Q.  Mr. Staten, if I could interrupt you, I
2  don't need you to read into the record all of this,
3  but if you could just review to yourself what is in --
4       MR. FOX: Why don't we do it faster. Number
5  2 asks for have you looked for more records relating
6  to hiring and firing of eviction workers or their
7  wages. That's what it says.
8  BY MR. BERGER:
9   Q.  That's not what it says. It asks for a
10  variety of different documents and I could ask the
11  questions here. You'll have an opportunity when we're
12  done to ask questions if you'd like, Mr. Fox. So
13  specifically for this number 2, have you searched for
14  all documents responsive to this request?
15  A.  For A.
16  Q.  For 2A through G.
17  A.  Yes.
18  Q.  And have you produced to plaintiffs all --
19  you being in this instance Butch Enterprises, produced
20  to plaintiffs all documents that you have found in
21  searching for these?
22  A.  Yes, I have.

Page 146

1   Q.  Can you tell me what you did to search for
2  these documents?
3   A.  Just went through some files of records that
4  I may have had, and the only ones I had that were
5  asked for I submitted to my attorney.
6   Q.  And which files did you look through?
7   A.  I don't have like a separate file for this
8  or that. I just went through some files and just
9  pulled out what I had. That was it. I don't have any
10  separate file for wages or withdrawal funds or any of
11  these things that they're asking, so I just went
12  through a bunch of paperwork and what I had I pulled.
13  Q.  So -- are there any other places that are
14  under Butch Enterprises' control or in Butch
15  Enterprises' custody or possession where you could
16  have looked for documents or these documents may exist
17  but you did not look?
18  A.  No.
19  Q.  How exactly are your files organized?
20  A.  They're not. I'm -- look, we're a real
21  small company, you know, and there's -- I might have
22  some forms organized, but I have a form here and a

Page 147

1  form there so I know where to reach and grab, but
2  other than that, everything was all piled in together,
3  and that's it.
4   Q.  Does Butch Enterprises have a bank account?
5   A.  Yes.
6   Q.  Did you seek from your bank bank records
7  that are under Butch Enterprises' control?
8   A.  Yes.
9   Q.  And did you produce those bank records in
10  this case?
11  A.  I produced everything that was asked of me.
12  Q.  So you went -- if I can understand correctly
13  what you're saying, you went to your bank and you
14  sought bank records that were responsive not just to
15  question 2 here but all of the document requests we've
16  submitted, and --
17  A.  Everything that was asked of me I did.
18  Q.  But when you say asked of you, do you mean
19  asked of you in these document requests, Exhibits 7
20  through 11?
21  A.  I don't remember these specifically being
22  asked. I can't remember -- say I remember each and

Page 148

1  every one, and if I don't remember them, but anything
2  that's been asked of me to produce pertaining to this
3  case, I have done that.
4   Q.  Okay, so that includes any document requests
5  that plaintiffs have served on you; is that correct?
6   A.  Yes.
7   Q.  Okay. So more broadly, when responding to
8  all five of the document requests that are in Exhibits
9  7 through 11, you have searched through files that
10  you've kept in Butch Enterprises' office for
11  responsive documents, and you've produced the
12  documents that are responsive to the requests that are
13  in Butch Enterprises' office; is that correct?
14  A.  Yes, I have.
15  Q.  You also went to a bank to seek bank
16  records; is that correct?
17  A.  I don't have to go to the bank because I can
18  just download it off the computer, and I'm sure that's
19  what I did.
20  Q.  Okay, so did you produce any of those
21  documents in this case?
22  A.  Whatever they asked me, I produced.